# FARE, ACTING CHIEF PROBATION OFFICER *v.* MICHAEL C.

No. 78–334.   Argued February 27, 1979—Decided June 20, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 728. POWELL, J., filed a dissenting opinion, *post*, p. 732.

*Mark Alan Hart,* Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *James H. Kline* and *Shunji Asari,* Deputy Attorneys General.

*Albert J. Menaster* argued the cause for respondent. With him on the brief were *Wilbur F. Littlefield, Dennis A. Fischer,* and *Kenneth I. Clayman.**

Mr. Justice Blackmun delivered the opinion of the Court.

In *Miranda* v. *Arizona,* 384 U. S. 436 (1966), this Court established certain procedural safeguards designed to protect the rights of an accused, under the Fifth and Fourteenth Amendments, to be free from compelled self-incrimination during custodial interrogation. The Court specified, among other things, that if the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial. *Id.,* at 444–445, 473–474.

In this case, the State of California, in the person of its acting chief probation officer, attacks the conclusion of the Supreme Court of California that a juvenile's request, made while undergoing custodial interrogation, to see his *probation officer* is *per se* an invocation of the juvenile's Fifth Amendment rights as pronounced in *Miranda.*

I

Respondent Michael C. was implicated in the murder of Robert Yeager. The murder occurred during a robbery of the victim's home on January 19, 1976. A small truck registered in the name of respondent's mother was identified as having been near the Yeager home at the time of the killing, and a young man answering respondent's description was seen by witnesses near the truck and near the home shortly before Yeager was murdered.

---

*\*Fred E. Inbau, Frank G. Carrington, Wayne W. Schmidt, George Nicholson, Edwin L. Miller, Jr.,* and *Peter C. Lehman* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

On the basis of this information, Van Nuys, Cal., police took respondent into custody at approximately 6:30 p. m. on February 4. Respondent then was 16½ years old and on probation to the Juvenile Court. He had been on probation since the age of 12. Approximately one year earlier he had served a term in a youth corrections camp under the supervision of the Juvenile Court. He had a record of several previous offenses, including burglary of guns and purse snatching, stretching back over several years.

Upon respondent's arrival at the Van Nuys station house two police officers began to interrogate him. The officers and respondent were the only persons in the room during the interrogation. The conversation was tape-recorded. One of the officers initiated the interview by informing respondent that he had been brought in for questioning in relation to a murder. The officer fully advised respondent of his *Miranda* rights. The following exchange then occurred, as set out in the opinion of the California Supreme Court, *In re Michael C.*, 21 Cal. 3d 471, 473–474, 579 P. 2d 7, 8 (1978) (emphasis added by that court):

"Q. .... Do you understand all of these rights as I have explained them to you?

"A. Yeah.

"Q. Okay, do you wish to give up your right to remain silent and talk to us about this murder?

"A. What murder? I don't know about no murder.

"Q. I'll explain to you which one it is if you want to talk to us about it.

"A. Yeah, I might talk to you.

"Q. Do you want to give up your right to have an attorney present here while we talk about it?

"A. *Can I have my probation officer here?*

"Q. Well I can't get a hold of your probation officer right now. You have the right to an attorney.

"A. How I know you guys won't pull no police officer in and tell me he's an attorney?

"Q. Huh?

"A. [How I know you guys won't pull no police officer in and tell me he's an attorney?]

"Q. Your probation officer is Mr. Christiansen.

"A. Yeah.

"Q. Well I'm not going to call Mr. Christiansen tonight. There's a good chance we can talk to him later, but I'm not going to call him right now. If you want to talk to us without an attorney present, you can. If you don't want to, you don't have to. But if you want to say something, you can, and if you don't want to say something you don't have to. That's your right. You understand that right?

"A. Yeah.

"Q. Okay, will you talk to us without an attorney present?

"A. Yeah I want to talk to you."

Respondent thereupon proceeded to answer questions put to him by the officers. He made statements and drew sketches that incriminated him in the Yeager murder.

Largely on the basis of respondent's incriminating statements, probation authorities filed a petition in Juvenile Court alleging that respondent had murdered Robert Yeager, in violation of Cal. Penal Code Ann. § 187 (West Supp. 1979), and that respondent therefore should be adjudged a ward of the Juvenile Court, pursuant to Cal. Welf. & Inst. Code Ann. § 602 (West Supp. 1979).[1] App. 4–5. Respondent thereupon moved to suppress the statements and sketches he gave the police during the interrogation. He alleged that the statements had been obtained in violation of *Miranda* in that

---

[1] The petition also alleged that respondent had participated in an attempted armed robbery earlier on the same evening Yeager was murdered. The Juvenile Court, however, held that the evidence was insufficient to support this charge and it was dismissed. App. 6. No issue relating to this second charge is before the Court.

his request to see his probation officer at the outset of the questioning constituted an invocation of his Fifth Amendment right to remain silent, just as if he had requested the assistance of an attorney. Accordingly, respondent argued that since the interrogation did not cease until he had a chance to confer with his probation officer, the statements and sketches could not be admitted against him in the Juvenile Court proceedings. In so arguing, respondent relied by analogy on the decision in *People* v. *Burton,* 6 Cal. 3d 375, 491 P. 2d 793 (1971), where the Supreme Court of California had held that a minor's request, made during custodial interrogation, to see his parents constituted an invocation of the minor's Fifth Amendment rights.

In support of his suppression motion, respondent called his probation officer, Charles P. Christiansen, as a witness. Christiansen testified that he had instructed respondent that if at any time he had "a concern with his family," or ever had "a police contact," App. 27, he should get in touch with his probation officer immediately. The witness stated that, on a previous occasion, when respondent had had a police contact and had failed to communicate with Christiansen, the probation officer had reprimanded him. *Id.,* at 28. This testimony, respondent argued, indicated that when he asked for his probation officer, he was in fact asserting his right to remain silent in the face of further questioning.

In a ruling from the bench, the court denied the motion to suppress. *Id.,* at 41–42. It held that the question whether respondent had waived his right to remain silent was one of fact to be determined on a case-by-case basis, and that the facts of this case showed a "clear waiver" by respondent of that right. *Id.,* at 42. The court observed that the transcript of the interrogation revealed that respondent specifically had told the officers that he would talk with them, and that this waiver had come at the outset of the interrogation and not after prolonged questioning. The court noted that

respondent was a "16 and a half year old minor who has been through the court system before, has been to [probation] camp, has a probation officer, [and is not] a young, naive minor with no experience with the courts." *Ibid.* Accordingly, it found that on the facts of the case respondent had waived his Fifth Amendment rights, notwithstanding the request to see his probation officer.[2]

On appeal, the Supreme Court of California took the case by transfer from the California Court of Appeal and, by a divided vote, reversed. *In re Michael C.,* 21 Cal. 3d 471, 579 P. 2d 7 (1978). The court held that respondent's "request to see his probation officer at the commencement of interrogation negated any possible willingness on his part to discuss his case with the police [and] thereby invoked his Fifth Amendment privilege." *Id.,* at 474, 579 P. 2d, at 8. The court based this conclusion on its view that, because of the juvenile court system's emphasis on the relationship between a probation officer and the probationer, the officer was "a trusted guardian figure who exercises the authority of the state as *parens patriae* and whose duty it is to implement

---

[2] The California Court of Appeal, in an opinion reported and then vacated, affirmed. *In re Michael C.,* 135 Cal. Rptr. 762 (1977). That court noted that since the Juvenile Court's findings of fact resolved against respondent his contention that the confession had been coerced from him by threats and promises, it would have to "conclude that there was a knowing and intelligent waiver of the minor's *Miranda* rights unless it can be said that the request to speak to a probation officer was in and of itself sufficient to invoke" respondent's Fifth Amendment privilege. *Id.,* at 765–766 (footnote omitted). It refused to extend the rule of *People* v. *Burton,* 6 Cal. 3d 375, 491 P. 2d 793 (1971), to include a request for a probation officer, finding it difficult to distinguish such a request from a request to see "one's football coach, music teacher or clergyman." 135 Cal. Rptr., at 766. Even if the *Burton* rule were applicable, the court held, there was sufficient evidence of an affirmative waiver of his rights by respondent to distinguish *Burton,* where the California Supreme Court had noted that there was "nothing in the way of affirmative proof that defendant did not intend to assert his privilege." 6 Cal. 3d, at 383, 491 P. 2d, at 798.

the protective and rehabilitative powers of the juvenile court." *Id.*, at 476, 579 P. 2d, at 10. As a consequence, the court found that a minor's request for his probation officer was the same as a request to see his parents during interrogation, and thus under the rule of *Burton* constituted an invocation of the minor's Fifth Amendment rights.

The fact that the probation officer also served as a peace officer, and, whenever a proceeding against a juvenile was contemplated, was charged with a duty to file a petition alleging that the minor had committed an offense, did not alter, in the court's view, the fact that the officer in the eyes of the juvenile was a trusted guardian figure to whom the minor normally would turn for help when in trouble with the police. 21 Cal. 3d, at 476, 579 P. 2d, at 10. Relying on *Burton,* the court ruled that it would unduly restrict *Miranda* to limit its reach in a case involving a minor to a request by the minor for an attorney, since it would be " 'fatuous to assume that a minor in custody will be in a position to call an attorney for assistance and it is unrealistic to attribute no significance to his call for help from the only person to whom he normally looks—a parent or guardian.' " 21 Cal. 3d, at 475–476, 579 P. 2d, at 9, quoting *People* v. *Burton,* 6 Cal. 3d, at 382, 491 P. 2d, at 797–798. The court dismissed the concern expressed by the State that a request for a probation officer could not be distinguished from a request for one's football coach, music teacher, or clergyman on the ground that the probation officer, unlike those other figures in the juvenile's life, was charged by statute to represent the interests of the juvenile. 21 Cal. 3d, at 477, 579 P. 2d, at 10.

The court accordingly held that the probation officer would act to protect the minor's Fifth Amendment rights in precisely the way an attorney would act if called for by the accused. In so holding, the court found the request for a probation officer to be a *per se* invocation of Fifth Amendment rights in the same way the request for an attorney was found

in *Miranda* to be, regardless of what the interrogation otherwise might reveal. In rejecting a totality-of-the-circumstances inquiry, the court stated:

> "Here, however, we face conduct which, regardless of considerations of capacity, coercion or voluntariness, per se invokes the privilege against self-incrimination. Thus our question turns not on whether the [respondent] had the ability, capacity or willingness to give a knowledgeable waiver, and hence whether he acted voluntarily, but whether, when he called for his probation officer, he exercised his Fifth Amendment privilege. We hold that in doing so he no less invoked the protection against self-incrimination than if he asked for the presence of an attorney." *Ibid.*, 579 P. 2d, at 10–11.

See also *id.*, at 478 n. 4, 579 P. 2d, at 11 n. 4. The court went on to conclude that since the State had not met its "burden of proving that a minor who requests to see his probation officer does not intend to assert his Fifth Amendment privilege," *id.*, at 478, 579 P. 2d, at 11, the trial court should not have admitted the confessions obtained after respondent had requested his probation officer.[3]

---

[3] Two justices concurred in the court's opinion and judgment. 21 Cal. 3d, at 478, 579 P. 2d, at 11. They expressed concern that a probation officer's public responsibilities would make it difficult for him to offer legal advice to a minor implicated in a crime, and that a minor advised to cooperate with the police, perhaps even to confess, justifiably could complain later "that he had been subjected to a variation of the Mutt-and-Jeff technique criticized in *Miranda*: initial interrogating by overbearing officers, then comforting by a presumably friendly and gentle peace officer in the guise of a probation officer." *Id.*, at 479, 579 P. 2d, at 12.

Two justices dissented. *Id.*, at 480, 579 P. 2d, at 12. They would have affirmed respondent's conviction on the basis of the finding of the Juvenile Court that, in light of all the circumstances surrounding the interrogation of respondent, there was sufficient affirmative proof that respondent had waived his privilege.

The dissenters pointed out that the opinion of the court was confusing in holding, on the one hand, that the request for a probation officer was

The State of California petitioned this Court for a writ of certiorari. MR. JUSTICE REHNQUIST, as Circuit Justice, stayed the execution of the mandate of the Supreme Court of California. 439 U. S. 1310 (1978). Because the California judgment extending the *per se* aspects of *Miranda* presents an important question about the reach of that case, we thereafter issued the writ. 439 U. S. 925 (1978).

## II

We note at the outset that it is clear that the judgment of

---

*per se* an invocation of the minor's Fifth Amendment rights, and, on the other, that reversal was required because the State had not carried its burden of proving that respondent, by requesting his probation officer, did not intend thereby to assert his Fifth Amendment privilege. *Ibid.,* 579 P. 2d, at 12–13.

There may well be ambiguity in this regard. See *id.,* at 477–478, 579 P. 2d, at 11. On the basis of that ambiguity, respondent argues that the California court did not establish a *per se* rule, but held only that on the facts here respondent's request to see his probation officer constituted an invocation of his Fifth Amendment rights. The decision in *People* v. *Randall,* 1 Cal. 3d 948, 464 P. 2d 114 (1970), upon which the California court relied in both *Burton* and the present case, however, indicates that the court did indeed establish a *per se* rule in this case. In *Randall,* the court stated that even though a suspect might have invoked his Fifth Amendment rights by asking for counsel or by stating he wished to remain silent, it might be possible that subsequent voluntary statements of the accused, not prompted by custodial interrogation, would be admissible if the State could show that they were the product of the voluntary decision of the accused to waive the rights he had asserted. *People* v. *Randall,* 1 Cal. 3d, at 956, and n. 7, 464 P. 2d, at 119, and n. 7.

*Randall* thus indicates that the *per se* language employed by the California Supreme Court in this case is compatible with the finding that the State could have negated the *per se* effect of the request for a probation officer by showing that, notwithstanding his *per se* invocation of his rights, respondent later voluntarily decided to waive those rights and volunteer statements. In light of *Randall,* and in light of the strong *per se* language used by the California Supreme Court in its opinion in this case, see, *e. g.,* 21 Cal. 3d, at 477, 579 P. 2d, at 10–11, we think that any ambiguity in that opinion must be resolved in favor of a conclusion that the court did in fact establish a *per se* rule.

the California Supreme Court rests firmly on that court's interpretation of federal law. This Court, however, has not heretofore extended the *per se* aspects of the *Miranda* safeguards beyond the scope of the holding in the *Miranda* case itself.[4] We therefore must examine the California court's decision to determine whether that court's conclusion so to extend *Miranda* is in harmony with *Miranda*'s underlying principles. For it is clear that "a State may not impose . . . greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them." *Oregon* v. *Hass,* 420 U. S. 714, 719 (1975) (emphasis in original). See *North Carolina* v. *Butler,* 441 U. S. 369 (1979).

The rule the Court established in *Miranda* is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation. 384 U. S., at 473. "Once [such] warnings have been given, the subsequent procedure is clear." *Ibid.*

> "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the

---

[4] Indeed, this Court has not yet held that *Miranda* applies with full force to exclude evidence obtained in violation of its proscriptions from consideration in juvenile proceedings, which for certain purposes have been distinguished from formal criminal prosecutions. See *McKeiver* v. *Pennsylvania,* 403 U. S. 528, 540–541 (1971) (plurality opinion). We do not decide that issue today. In view of our disposition of this case, we assume without deciding that the *Miranda* principles were fully applicable to the present proceedings.

individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." *Id.*, at 473–474 (footnote omitted).

Any statements obtained during custodial interrogation conducted in violation of these rules may not be admitted against the accused, at least during the State's case in chief. *Id.*, at 479. Cf. *Harris* v. *New York,* 401 U. S. 222, 224 (1971).

Whatever the defects, if any, of this relatively rigid requirement that interrogation must cease upon the accused's request for an attorney, *Miranda's* holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis. See *Michigan* v. *Tucker,* 417 U. S. 433, 443–446 (1974).

The California court in this case, however, significantly has extended this rule by providing that a request by a juvenile for his probation officer has the same effect as a request for an attorney. Based on the court's belief that the probation officer occupies a position as a trusted guardian figure in the minor's life that would make it normal for the minor to turn to the officer when apprehended by the police, and based as well on the state-law requirement that the officer represent the interest of the juvenile, the California decision found that consultation with a probation officer fulfilled the role for the juvenile that consultation with an attorney does in general,

acting as a " 'protective [device] . . . to dispel the compulsion inherent in custodial surroundings.' " 21 Cal. 3d, at 477, 579 P. 2d, at 10, quoting *Miranda* v. *Arizona*, 384 U. S., at 458.

The rule in *Miranda*, however, was based on this Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation. Because of this special ability of the lawyer to help the client preserve his Fifth Amendment rights once the client becomes enmeshed in the adversary process, the Court found that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system" established by the Court. *Id.,* at 469. Moreover, the lawyer's presence helps guard against overreaching by the police and ensures that any statements actually obtained are accurately transcribed for presentation into evidence. *Id.,* at 470.

The *per se* aspect of *Miranda* was thus based on the unique role the lawyer plays in the adversary system of criminal justice in this country. Whether it is a minor or an adult who stands accused, the lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts. For this reason, the Court fashioned in *Miranda* the rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease.

A probation officer is not in the same posture with regard to either the accused or the system of justice as a whole. Often he is not trained in the law, and so is not in a position to advise the accused as to his legal rights. Neither is he a trained advocate, skilled in the representation of the interests of his client before both police and courts. He does not assume the power to act on behalf of his client by virtue of his status as adviser, nor are the communications of the accused to the probation officer shielded by the lawyer-client privilege.

Moreover, the probation officer is the employee of the State which seeks to prosecute the alleged offender. He is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers. He owes an obligation to the State, notwithstanding the obligation he may also owe the juvenile under his supervision. In most cases, the probation officer is duty bound to report wrongdoing by the juvenile when it comes to his attention, even if by communication from the juvenile himself. Indeed, when this case arose, the probation officer had the responsibility for filing the petition alleging wrongdoing by the juvenile and seeking to have him taken into the custody of the Juvenile Court. It was respondent's probation officer who filed the petition against him, and it is the acting chief of probation for the State of California, a probation officer, who is petitioner in this Court today.[5]

---

[5] When this case arose, a California statute provided that a proceeding in juvenile court to declare a minor a ward of the court was to be commenced by the filing of a petition by a probation officer. Cal. Welf. & Inst. Code Ann. § 650 (West 1972). This provision since has been amended to provide that most such petitions are to be filed by the prosecuting attorney. 1976 Cal. Stats., ch. 1071, § 20. Respondent argues that, whatever the status of the probation officer as a peace officer at the time this case arose, the amendment of § 650 indicates that in the future a probation officer is not to be viewed as a legal adversary of the accused juvenile. Consequently, respondent believes that any holding of this Court with regard to respondent's 1976 request for a probation officer will be mere dictum with regard to a juvenile's similar request today. Brief for Respondent 9–10, and n. 4.

We disagree. The fact that a California probation officer in 1976 was responsible for initiating a complaint is only one factor in our analysis. The fact remains that a probation officer does not fulfill the role in our system of criminal justice that an attorney does, regardless of whether he acts merely as a counselor or has significant law enforcement duties. And in California, as in many States, the other duties of a probation officer are incompatible with the view that he may act as a counselor to a juvenile accused of crime. The very California statute that imposes upon the probation officer the duty to represent the interests of the juvenile also provides: "It shall be the duty of the probation officer to prepare for

In these circumstances, it cannot be said that the probation officer is able to offer the type of independent advice that an accused would expect from a lawyer retained or assigned to assist him during questioning. ˙ Indeed, the probation officer's duty to his employer in many, if not most, cases would conflict sharply with the interests of the juvenile. For where an attorney might well advise his client to remain silent in the face of interrogation by the police, and in doing so would be "exercising [his] good professional judgment . . . to protect to the extent of his ability the rights of his client," *Miranda* v. *Arizona*, 384 U. S., at 480–481, a probation officer would be bound to advise his charge to cooperate with the police. The justices who concurred in the opinion of the California Supreme Court in this case aptly noted: "Where a conflict between the minor and the law arises, the probation officer can be neither neutral nor in the minor's corner." 21 Cal. 3d, at 479, 579 P. 2d, at 12. It thus is doubtful that a general rule can be established that a juvenile, in every case, looks to his probation officer as a "trusted guardian figure" rather than as an officer of the court system that imposes punishment.

By the same token, a lawyer is able to protect his client's rights by learning the extent, if any, of the client's involvement in the crime under investigation, and advising his client ac-

every hearing [of criminal charges against a juvenile] a social study of the minor, containing such matters as may be relevant to a proper disposition of the case." Cal. Welf. & Inst. Code Ann. § 280 (West Supp. 1979).

Similarly, a probation officer is required, upon the order of the juvenile court or the Youth Authority, to investigate the circumstances surrounding the charge against the minor and to file written reports and recommendations. §§ 281, 284. And a probation officer in California continues to have the powers and authority of a peace officer in connection with any violation of a criminal statute that is discovered by the probation officer in the course of his probation activities. § 283; Cal. Penal Code Ann. § 830.5 (West 1970). The duties of a peace officer, like the investigative and reporting duties of probation officers, are incompatible with the role of legal adviser to a juvenile accused of crime.

cordingly. To facilitate this, the law rightly protects the communications between client and attorney from discovery. We doubt, however, that similar protection will be afforded the communications between the probation officer and the minor. Indeed, we doubt that a probation officer, consistent with his responsibilities to the public and his profession, could withhold from the police or the courts facts made known to him by the juvenile implicating the juvenile in the crime under investigation.

We thus believe it clear that the probation officer is not in a position to offer the type of legal assistance necessary to protect the Fifth Amendment rights of an accused undergoing custodial interrogation that a lawyer can offer. The Court in *Miranda* recognized that "the attorney plays a vital role in the administration of criminal justice under our Constitution." 384 U. S., at 481. It is this pivotal role of legal counsel that justifies the *per se* rule established in *Miranda,* and that distinguishes the request for counsel from the request for a probation officer, a clergyman, or a close friend. A probation officer simply is not necessary, in the way an attorney is, for the protection of the legal rights of the accused, juvenile or adult. He is significantly handicapped by the position he occupies in the juvenile system from serving as an effective protector of the rights of a juvenile suspected of a crime.

The California Supreme Court, however, found that the close relationship between juveniles and their probation officers compelled the conclusion that a probation officer, for purposes of *Miranda,* was sufficiently like a lawyer to justify extension of the *per se* rule. 21 Cal. 3d, at 476, 579 P. 2d, at 10. The fact that a relationship of trust and cooperation between a probation officer and a juvenile might exist, however, does not indicate that the probation officer is capable of rendering effective legal advice sufficient to protect the juvenile's rights during interrogation by the police, or of providing the other services rendered by a lawyer. To find otherwise

would be "an extension of the *Miranda* requirements [that] would cut this Court's holding in that case completely loose from its own explicitly stated rationale." *Beckwith* v. *United States,* 425 U. S. 341, 345 (1976). Such an extension would impose the burdens associated with the rule of *Miranda* on the juvenile justice system and the police without serving the interests that rule was designed simultaneously to protect. If it were otherwise, a juvenile's request for almost anyone he considered trustworthy enough to give him reliable advice would trigger the rigid rule of *Miranda.*

Similarly, the fact that the State has created a statutory duty on the part of the probation officer to protect the interests of the juvenile does not render the probation officer any more capable of rendering legal assistance to the juvenile or of protecting his legal rights, especially in light of the fact that the State has also legislated a duty on the part of the officer to report wrongdoing by the juvenile and serve the ends of the juvenile court system. The State cannot transmute the relationship between probation officer and juvenile offender into the type of relationship between attorney and client that was essential to the holding of *Miranda* simply by legislating an amorphous "duty to advise and care for the juvenile defendant." 21 Cal. 3d, at 477, 579 P. 2d, at 10. Though such a statutory duty might serve to distinguish to some degree the probation officer from the coach and the clergyman, it does not justify the extension of *Miranda* to requests to see probation officers. If it did, the State could expand the class of persons covered by the *Miranda per se* rule simply by creating a duty to care for the juvenile on the part of other persons, regardless of whether the logic of *Miranda* would justify that extension.

Nor do we believe that a request by a juvenile to speak with his probation officer constitutes a *per se* request to remain silent. As indicated, since a probation officer does not fulfill the important role in protecting the rights of the ac-

cused juvenile that an attorney plays, we decline to find that the request for the probation officer is tantamount to the request for an attorney. And there is nothing inherent in the request for a probation officer that requires us to find that a juvenile's request to see one necessarily constitutes an expression of the juvenile's right to remain silent. As discussed below, courts may take into account such a request in evaluating whether a juvenile in fact had waived his Fifth Amendment rights before confessing. But in other circumstances such a request might well be consistent with a desire to speak with the police. In the absence of further evidence that the minor intended in the circumstances to invoke his Fifth Amendment rights by such a request, we decline to attach such overwhelming significance to this request.

We hold, therefore, that it was error to find that the request by respondent to speak with his probation officer *per se* constituted an invocation of respondent's Fifth Amendment right to be free from compelled self-incrimination. It therefore was also error to hold that because the police did not then cease interrogating respondent the statements he made during interrogation should have been suppressed.

## III

*Miranda* further recognized that after the required warnings are given the accused, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U. S., at 475. We noted in *North Carolina* v. *Butler*, 441 U. S., at 373, that the question whether the accused waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." Thus, the determination whether statements obtained during custodial

interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. *Miranda* v. *Arizona,* 384 U. S., at 475–477.

This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. See *North Carolina* v. *Butler, supra.*

Courts repeatedly must deal with these issues of waiver with regard to a broad variety of constitutional rights. There is no reason to assume that such courts—especially juvenile courts, with their special expertise in this area—will be unable to apply the totality-of-the-circumstances analysis so as to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved. Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives

his Fifth Amendment rights and voluntarily consents to interrogation.

In this case, we conclude that the California Supreme Court should have determined the issue of waiver on the basis of all the circumstances surrounding the interrogation of respondent. The Juvenile Court found that under this approach, respondent in fact had waived his Fifth Amendment rights and consented to interrogation by the police after his request to see his probation officer was denied. Given its view of the case, of course, the California Supreme Court did not consider this issue, though it did hold that the State had failed to prove that, notwithstanding respondent's request to see his probation officer, respondent had not intended to invoke his Fifth Amendment rights.

We feel that the conclusion of the Juvenile Court was correct. The transcript of the interrogation reveals that the police officers conducting the interrogation took care to ensure that respondent understood his rights. They fully explained to respondent that he was being questioned in connection with a murder. They then informed him of all the rights delineated in *Miranda,* and ascertained that respondent understood those rights. There is no indication in the record that respondent failed to understand what the officers told him. Moreover, after his request to see his probation officer had been denied, and after the police officer once more had explained his rights to him, respondent clearly expressed his willingness to waive his rights and continue the interrogation.

Further, no special factors indicate that respondent was unable to understand the nature of his actions. He was a 16½-year-old juvenile with considerable experience with the police. He had a record of several arrests. He had served time in a youth camp, and he had been on probation for several years. He was under the full-time supervision of probation authorities. There is no indication that he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be. He was not

worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.

On these facts, we think it clear that respondent voluntarily and knowingly waived his Fifth Amendment rights. Respondent argues, however, that any statements he made during interrogation were coerced. Specifically, respondent alleges that the police made threats and promises during the interrogation to pressure him into cooperating in the hope of obtaining leniency for his cooperative attitude. He notes also that he repeatedly told the officers during his interrogation that he wished to stop answering their questions, but that the officers ignored his pleas. He argues further that the record reveals that he was afraid that the police would coerce him, and that this fear caused him to cooperate. He points out that at one point the transcript revealed that he wept during the interrogation.

Review of the entire transcript reveals that respondent's claims of coercion are without merit. As noted, the police took care to inform respondent of his rights and to ensure that he understood them. The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*. See 384 U. S., at 445–455. The police did indeed indicate that a cooperative attitude would be to respondent's benefit, but their remarks in this regard were far from threatening or coercive. And respondent's allegation that he repeatedly asked that the interrogation cease goes too far: at some points he did state that he did not know the answer to a question put to him or that he could not, or would not, answer the question, but these statements were not assertions of his right to remain silent.

## IV

We hold, in short, that the California Supreme Court erred in finding that a juvenile's request for his probation officer was a *per se* invocation of that juvenile's Fifth Amendment

rights under *Miranda*. We conclude, rather, that whether the statements obtained during subsequent interrogation of a juvenile who has asked to see his probation officer, but who has not asked to consult an attorney or expressly asserted his right to remain silent, are admissible on the basis of waiver remains a question to be resolved on the totality of the circumstances surrounding the interrogation. On the basis of the record in this case, we hold that the Juvenile Court's findings that respondent voluntarily and knowingly waived his rights and consented to continued interrogation, and that the statements obtained from him were voluntary, were proper, and that the admission of those statements in the proceeding against respondent in Juvenile Court was correct.

The judgment of the Supreme Court of California is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEVENS join, dissenting.

In *Miranda* v. *Arizona,* 384 U. S. 436 (1966), this Court sought to ensure that the inherently coercive pressures of custodial interrogation would not vitiate a suspect's privilege against self-incrimination. Noting that these pressures "can operate very quickly to overbear the will of one merely made aware of his privilege," *id.,* at 469, the Court held:

"If [a suspect in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interro-

gation must cease until an attorney is present." *Id.*, at 473–474 (footnote omitted).

See also *id.*, at 444–445.

As this Court has consistently recognized, the coerciveness of the custodial setting is of heightened concern where, as here, a juvenile is under investigation. In *Haley* v. *Ohio,* 332 U. S. 596 (1948), the plurality reasoned that because a 15½-year-old minor was particularly susceptible to overbearing interrogation tactics, the voluntariness of his confession could not "be judged by the more exacting standards of maturity." *Id.*, at 599. The Court reiterated this point in *Gallegos* v. *Colorado,* 370 U. S. 49, 54 (1962), observing that a 14-year-old suspect could not "be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions." The juvenile defendant, in the Court's view, required

> "the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not." *Ibid.*

And, in *In re Gault,* 387 U. S. 1, 55 (1967), the Court admonished that "the greatest care must be taken to assure that [a minor's] admission was voluntary."

It is therefore critical in the present context that we construe *Miranda*'s prophylactic requirements broadly to accomplish their intended purpose—"dispel[ling] the compulsion inherent in custodial surroundings." 384 U. S., at 458. To effectuate this purpose, the Court must ensure that the "protective device" of legal counsel, *id.*, at 465–466, 469, be readily available, and that any intimation of a desire to preclude questioning be scrupulously honored. Thus, I believe *Miranda* requires that interrogation cease whenever a juvenile requests an adult who is obligated to represent his interests. Such a

request, in my judgment, constitutes both an attempt to obtain advice and a general invocation of the right to silence. For, as the California Supreme Court recognized, " '[i]t is fatuous to assume that a minor in custody will be in a position to call an attorney for assistance,' " 21 Cal. 3d 471, 475–476, 579 P. 2d 7, 9 (1978), quoting *People* v. *Burton,* 6 Cal. 3d 375, 382, 491 P. 2d 793, 797 (1971), or that he will trust the police to obtain a lawyer for him.[1]   A juvenile in these circumstances will likely turn to his parents, or another adult responsible for his welfare, as the only means of securing legal counsel. Moreover, a request for such adult assistance is surely inconsistent with a present desire to speak freely.   Requiring a strict verbal formula to invoke the protections of *Miranda* would "protect the knowledgeable accused from stationhouse coercion while abandoning the young person who knows no more than to ask for the . . . person he trusts." *Chaney* v. *Wainwright,* 561 F. 2d 1129, 1134 (CA5 1977) (Goldberg, J., dissenting).

On my reading of *Miranda,* a California juvenile's request for his probation officer should be treated as a *per se* assertion of Fifth Amendment rights.   The California Supreme Court determined that probation officers have a statutory duty to represent minors' interests and, indeed, are "trusted guardian figure[s]" to whom a juvenile would likely turn for assistance. 21 Cal. 3d, at 476, 579 P. 2d, at 10.   In addition, the court found, probation officers are particularly well suited to assist a juvenile "on such matters as to whether or not he should obtain an attorney" and "how to conduct himself with police." *Id.,* at 476, 477, 579 P. 2d, at 10.   Hence, a juvenile's request

---

[1] The facts of the instant case are illustrative.   When the police offered to obtain an attorney for respondent, he replied: "How I know you guys won't pull no police officer in and tell me he's an attorney?" *Ante,* at 710. Significantly, the police made no attempt to allay that concern.   See 21 Cal. 3d, at 476 n. 3, 579 P. 2d, at 10 n. 3.

for a probation officer may frequently be an attempt to secure protection from the coercive aspects of custodial questioning.[2]

This Court concludes, however, that because a probation officer has law enforcement duties, juveniles generally would not call upon him to represent their interests, and if they did, would not be well served. *Ante,* at 721–722. But that conclusion ignores the California Supreme Court's express determination that the officer's responsibility to initiate juvenile proceedings did not negate his function as personal adviser to his wards.[3] I decline to second-guess that court's assessment of state law. See *Murdock* v. *Memphis,* 20 Wall. 590, 626 (1875); *General Trading Co.* v. *State Tax Comm'n,* 322 U. S. 335, 337 (1944); *Scripto, Inc.* v. *Carson,* 362 U. S. 207, 210 (1960).[4] Further, although the majority here spec-

---

[2] The Court intimates that construing a request for a probation officer as an invocation of the Fifth Amendment privilege would undermine the specificity of *Miranda's* prophylactic rules. *Ante,* at 718. Yet the Court concedes that the statutory duty to "advise and care for the juvenile defendant," 21 Cal. 3d, at 477, 579 P. 2d, at 10, distinguishes probation officers from other adults, such as coaches and clergymen. *Ante,* at 723. Since law enforcement officials should be on notice of such legal relationships, they would presumably have no difficulty determining whether a suspect has asserted his Fifth Amendment rights.

Although I agree with my Brother POWELL that, on the facts here, respondent was not "subjected to a fair interrogation free from inherently coercive circumstances," *post,* at 734, I do not believe a case-by-case approach provides police sufficient guidance, or affords juveniles adequate protection.

[3] In filing the petition and performing the other functions enumerated *ante,* at 720–721, n. 5, the probation officer must act in the best interests of the minor. See *In re Steven C.,* 9 Cal. App. 3d 255, 264–265, 88 Cal. Rptr. 97, 101–102 (1970).

[4] One thing is certain. The California Supreme Court is more familiar with the duties and performance of its probation officers than we are.

Of course, "[i]t is peculiarly within the competence of the highest court of a State to determine that in its jurisdiction the police should be subject to more stringent rules than are required as a federal constitutional minimum." *Oregon* v. *Hass,* 420 U. S. 714, 728 (1975) (MARSHALL, J., dissenting). See also *People* v. *Disbrow,* 16 Cal. 3d 101, 545 P. 2d 272

ulates that probation officers have a duty to advise cooperation with the police, *ante,* at 721—a proposition suggested only in the concurring opinion of two justices below, 21 Cal. 3d, at 479, 579 P. 2d, at 11–12 (Mosk, J., joined by Bird, C. J., concurring)—respondent's probation officer instructed all his charges "not to go and admit openly to an offense, [but rather] to get some type of advice from . . . parents or a lawyer." App. 30. Absent an explicit statutory provision or judicial holding, the officer's assessment of the obligations imposed by state law is entitled to deference by this Court.

Thus, given the role of probation officers under California law, a juvenile's request to see his officer may reflect a desire for precisely the kind of assistance *Miranda* guarantees an accused before he waives his Fifth Amendment rights. At the very least, such a request signals a desire to remain silent until contact with the officer is made. Because the Court's contrary determination withdraws the safeguards of *Miranda* from those most in need of protection, I respectfully dissent.

MR. JUSTICE POWELL, dissenting.

Although I agree with the Court that the Supreme Court of California misconstrued *Miranda* v. *Arizona,* 384 U. S. 436 (1966),[1] I would not reverse the California court's judgment. This Court repeatedly has recognized that "the greatest care" must be taken to assure that an alleged confession of a juvenile was voluntary. See, *e. g., In re Gault,* 387 U. S. 1, 55

---

(1976) (refusing to follow *Harris* v. *New York,* 401 U. S. 222 (1971)); Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).

[1] The California Supreme Court, purporting to apply *Miranda* v. *Arizona,* stated:

"Here . . . we face conduct which, regardless of considerations of capacity, coercion or voluntariness, per se invokes the privilege against self-incrimination." 21 Cal. 3d 471, 477, 579 P. 2d 7, 10 (1978). I agree with the Court's opinion today that *Miranda* cannot be read as support for any such *per se* rule.

(1967); *Gallegos* v. *Colorado,* 370 U. S. 49, 54 (1962); *Haley* v. *Ohio,* 332 U. S. 596, 599–600 (1948) (plurality opinion). Respondent was a young person, 16 years old at the time of his arrest and the subsequent prolonged interrogation at the station house. Although respondent had had prior brushes with the law, and was under supervision by a probation officer, the taped transcript of his interrogation—as well as his testimony at the suppression hearing—demonstrates that he was immature, emotional,[2] and uneducated, and therefore was likely to be vulnerable to the skillful, two-on-one, repetitive style of interrogation to which he was subjected. App. 54–82.

When given *Miranda* warnings and asked whether he desired an attorney, respondent requested permission to "have my probation officer here," a request that was refused. *Id.,* at 55. That officer testified later that he had communicated frequently with respondent, that respondent had serious and "extensive" family problems, and that the officer had instructed respondent to call him immediately "at any time he has a police contact, even if they stop him and talk to him on the street." *Id.,* at 26–31.[3] The reasons given by the probation officer for having so instructed his charge were substantially the same reasons that prompt this Court to examine with special care the circumstances under which a minor's alleged confession was obtained. After stating that respondent had been "going through problems," the officer observed that "many times the kids don't understand what is going on, and what they are supposed to do relative to police . . . ." *Id.,* at 29. This view of the limited understanding of the average 16-year-old was borne out by respondent's question when,

---

[2] The Juvenile Court Judge observed that he had "heard the tapes" of the interrogation, and was "aware of the fact that Michael [respondent] was crying at the time he talked to the police officers." App. 53.

[3] The Supreme Court of California stated that a "probation officer is an official appointed pursuant to legislative enactment 'to represent the interests' of the juvenile [and] . . . has borne the duty to advise and care for the juvenile defendant." 21 Cal. 3d, at 477, 579 P. 2d, at 10.

during interrogation, he was advised of his right to an attorney: "How I know you guys won't pull no police officer in and tell me he's an attorney?" *Id.,* at 55. It was during this part of the interrogation that the police had denied respondent's request to "have my probation officer here." *Ibid.*

The police then proceeded, despite respondent's repeated denial of any connection to the murder under investigation, see *id.,* at 56–60, persistently to press interrogation until they extracted a confession. In *In re Gault,* in addressing police interrogation of detained juveniles, the Court stated:

"If counsel was not present for some permissible reason when an admission was obtained [from a child], the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." 387 U. S., at 55.

It is clear that the interrogating police did not exercise "the greatest care" to assure that respondent's "admission was voluntary." [4] In the absence of counsel, and having refused to call the probation officer, they nevertheless engaged in protracted interrogation.

Although I view the case as close, I am not satisfied that this particular 16-year-old boy, in this particular situation, was subjected to a fair interrogation free from inherently coercive circumstances. For these reasons, I would affirm the judgment of the Supreme Court of California.

---

[4] Minors who become embroiled with the law range from the very young up to those on the brink of majority. Some of the older minors become fully "street-wise," hardened criminals, deserving no greater consideration than that properly accorded all persons suspected of crime. Other minors are more of a child than an adult. As the Court indicated in *In re Gault,* 387 U. S. 1 (1967), the facts relevant to the care to be exercised in a particular case vary widely. They include the minor's age, actual maturity, family environment, education, emotional and mental stability, and, of course, any prior record he might have.