Ramona **HUFF**, Petitioner and Appellee,

v.

**K.P., K.P., K.P., Respondents and Appellants.**

**Civ. No. 9873.**

Supreme Court of North Dakota.

Feb. 24, 1981.

Kent M. Morrow, Asst. State's Atty., Watford City, for petitioner and appellee.

James L. Taylor, Watford City, for respondents and appellants.

ERICKSTAD, Chief Justice.

K. P., a child, appeals from an order of the Juvenile Court of McKenzie County adjudicating her as a delinquent child for violating Section 12.1-23-04, N.D.C.C. (theft of property lost, mislaid, or delivered by mistake). We reverse the adjudication of delinquency.

Ramona Huff, the petitioner, left a down-filled leather vest in a tourist park after she had removed it while playing basketball. When she returned the following day it was not there. Ramona placed an advertisement in a local paper. In response to this advertisement, Ramona received a call from the mother of a young girl who stated she believed her daughter had one of the decorative pins which were attached to the vest. Ramona identified the pin and it was returned to her. The young girl (hereinafter

Joan) said K. P. (hereinafter Karen), both pseudonyms, had had the vest and the other pin. Ramona contacted Karen and the other pin was returned. Karen did not testify.

The following facts come from Ramona's testimony. Karen said that she and Joan picked up the vest while in the tourist park Saturday morning, March 29. Karen first stated Joan had the vest. Upon learning that Ramona had already talked to Joan, Karen said it was left with the woman for whom Karen babysat. This lead was followed up with no results. Karen then told Ramona another young girl had the vest. This also was followed up with no results. Karen then said that she left the vest at the high school after she attended a grade school wrestling match.

Two police officers who questioned Karen testified that Karen told them she had worn the vest to a wrestling tournament and had left the vest in the school's gymnasium. There is no indication in the record that *Miranda* warnings were given to Karen before she was questioned.

After the vest could not be located, Ramona filed a petition to adjudicate Karen a delinquent for violating Section 12.1–23–04, N.D.C.C., *Theft of property lost, mislaid, or delivered by mistake.* Karen now asserts the following issues upon appeal:

"I.

"Is there a sufficiency of the evidence for a determination of delinquency?

"II.

"Must a child charged under a felony statute have legal counsel to meet the constitutional requirements of due process?

1. *"27–20–26. Right to counsel.—*

"1. Except as otherwise provided under this chapter, a party is entitled to representation by legal counsel at all stages of any proceedings under this chapter and, if as a needy person he is unable to employ counsel, to have the court provide counsel for him. If a party appears without counsel the court shall ascertain whether he knows of his right thereto and to be provided with counsel by

"III.

"Should the *Miranda* Warnings have been given to the child (K. P.) and her father (K. P.)?"

## I. SCOPE OF REVIEW

■ This is an appellate review of an action which adjudicated Karen to be delinquent. The scope of review on appeal from juvenile court is stated in *In Interest of D.S.*, 263 N.W.2d 114 (N.D.1978):

"This Court's scope of review under the Uniform Juvenile Court Act, pursuant to § 27–20–56 of the North Dakota Century Code, is equivalent to the former procedure of trial de novo. ... This Court will independently review the evidence presented to the juvenile court at the hearing on the motion to suppress. ... Although the juvenile court's findings of fact are entitled to appreciable weight, this Court is not bound by those findings." [Citations omitted.] 263 N.W.2d at 116.

## II. ASSISTANCE OF COUNSEL

■ Pursuant to Section 27–20–26, N.D.C.C.,[1] of the Juvenile Court Act, Karen was entitled to be represented by counsel at the adjudicatory hearing. This right, however, is capable of being waived. *In Interest of D.S., supra,* 263 N.W.2d at 119. Whether or not a juvenile has knowingly and voluntarily waived his right to counsel must be made upon an inquiry into the totality of the circumstances. *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).

In *Fare,* the United States Supreme Court applied the totality of the circum-

the court if he is a needy person. The court may continue the proceeding to enable a party to obtain counsel and shall provide counsel for an unrepresented needy person upon his request. Counsel must be provided for a child not represented by his parent, guardian, or custodian. If the interests of two or more parties conflict separate counsel shall be provided for each of them." § 27–20–26(1), N.D. C.C.

stances test in determining whether or not a juvenile had waived his right to remain silent and his right to an attorney. The Court said:

"This totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." 99 S.Ct. at 2572.

Counsel for Karen asserts that a child of eleven years of age can never knowingly, intelligently, and voluntarily waive her right to counsel. He also asserts that Karen's parents were not informed sufficiently about the nature of the proceedings in order to intelligently waive their right to counsel and to adequately represent Karen. Section 27–20–26 requires that counsel *must* be provided only when a juvenile is not represented by his parents, guardian or custodian. A child is still entitled to be represented by counsel when her parents are representing her and she has not know-

ingly and voluntarily waived her own right to counsel.

■ A juvenile, however, may waive this right when she is represented by her parents, guardian, or custodian. *In Interest of D.S., supra*, 263 N.W.2d at 119. Whether or not the parent, guardian, or custodian is capable of representing the juvenile in the proceedings is one of the facts which must be considered when applying the totality of the circumstances test when determining whether or not the juvenile has knowingly and voluntarily waived her right to counsel. We are not prepared to say that a child is not capable of knowingly and voluntarily waiving counsel and must always be represented by counsel even when represented by her parents.

■ Therefore, we are persuaded to apply the totality of the circumstances test to determine whether or not Karen and her parents waived her right to be represented by counsel.

The summons served upon Karen and admittedly received by her parents clearly and conspicuously states that the party is entitled to counsel. In fact, after receiving the summons, Karen's parents did contact an attorney who secured a continuance of the hearing to a later date. Subsequently, Karen and her parents appeared in court without an attorney. The court again clearly advised Karen and her parents of their right to an attorney. After this, the court asked each of them, Karen and her parents, whether or not they wished to proceed without an attorney.[2] Each answered af-

2. "THE COURT: All right. Let's get into some of the rights.
"The right to an attorney, right to counsel.
"A person—all persons are entitled to representation by an attorney, by legal counsel at all stages of any proceedings in Juvenile Court.
"If a person is a needy person—that is if he cannot afford to obtain counsel, attorney without undue hardship—then he may have the Court imply or assign an attorney to represent him so long as he is unable to provide for legal services without undue hardship.
"I see that the . . . do not come to court with an attorney; am I correct?
"MR. . . . : Correct.

"THE COURT: Mr. . . . , do you and your wife and Karen know of your right to have an attorney?
"MR. . . . : Yes.
"THE COURT: Do you wish to have an attorney?
"MR. . . . : I think we'll try it without one.
"THE COURT: Pardon me?
"MR. . . . : We'll try it without one.
"THE COURT: You wish to proceed without an attorney?
"MR. . . . : That's right.
"THE COURT: And that is the wish of only yourself or are you also speaking for Mrs. . . . and Karen?
"MR. . . . : That's right.
"THE COURT: What is right?

firmatively. The court also questioned Karen's father about the attorney who had obtained the continuance.[3]

A review of the facts shows that there is no assertion that any of the parties are physically or mentally impaired. They sought the advice of an attorney and subsequently determined to proceed without an attorney. They knew of the possibility that Karen could be placed in the custody of the officials of the State Industrial School. Karen, her father, and her mother were informed of their right to an attorney and affirmatively waived that right.

A factor weighing against a knowing and voluntary waiver is that Karen was only 11 years old. The facts show, however, that Karen's father did act as an advocate for his daughter and attempted to represent her best interests, albeit rather ineffectively. Taking all of these facts into consideration, we find that Karen and her parents did knowingly and voluntarily waive their right to be represented by counsel.

## III. RIGHT TO MIRANDA WARNINGS

■ Counsel for Karen asserts that Karen should have been informed of her rights when she was questioned by police concerning the incident as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The State contends that Karen was not subjected to a custodial interrogation and, regardless, none of her statements were introduced into evidence. We disagree on both issues.

Karen was questioned at the courthouse in the presence of her father by two police officers. As Karen was subjected to a custodial interrogation which had focused upon her, she was entitled to be informed of her rights. *In Interest of D.S., supra*, 263 N.W.2d at 119; *Interest of R.W.B.*, 241 N.W.2d 546, 556 (N.D.1976); *State v. Fields*, 294 N.W.2d 404, 406–09 (N.D.1980).

The transcript indicates that the officers questioned Karen regarding the vest and received answers indicating Karen wore the vest and had left it at the wrestling tournament. Karen's statements concerning her control and disposal of the vest were elicited in violation of her *Miranda* rights.

In *Fare v. Michael C., supra*, 99 S.Ct. at 2568, the United States Supreme Court said:

"The rule the Court established in *Miranda* is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation. 384 U.S., at 473, 86 S.Ct., at 1627."

"MR....: Oh, I am speaking for all three of us.
"THE COURT: Pardon me?
"MR....: I am speaking for all three of us.
"THE COURT: All right. Well, of course, a parent, should he so choose, in his role as parent can represent his child at a hearing like this.
"MR....: This is what I would like. That is what I plan on.
"THE COURT: That is what Mr. ... plans on doing?
"MR....: That's right.
"THE COURT: I see. I take it, then, Mr. ...., that you have talked with Mrs. ... and with Karen about this matter?
"MR....: That's right.
"THE COURT: And in your role as parent you are going to advise and represent Karen at this time?
"MR....: That's right.
"THE COURT: Is that what you wish, Mrs. ...?

"MRS. ...: Right.
"THE COURT: Karen?
"MISS ...: Yeah.
"THE COURT: Thank you. Some of the other rights that I should advise you of before we proceed are as follows:"

3. "THE COURT: Oh, I see. Incidentally, at that time, I thought Mr. Taylor was representing [you].
"MR....: Well, I guess in a way. Not really. We just went up and asked him some questions is all.
"THE COURT: Well, since receiving the Petition, you talked with an attorney. He made the initial appearance and secured the hearing to be continued to this time?
"MR....: That's right.
"THE COURT: Since talking to the attorney, you have decided to proceed without the attorney; is that right?
"MR....: That is right."

Karen's statements were elicited by the police without giving *Miranda* warnings. No objection, however, was made. As we said in *State v. Rindy*, 299 N.W.2d 783 (N.D.1980), "In the absence of obvious error, a sine qua non for review by this court is 'that the matter has been appropriately raised in the trial court so that the trial court can intelligently rule on it.'" 299 N.W.2d at 785.

■ Section 27–20–56, N.D.C.C., states that the appeal shall be heard upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. We will not entertain objections which are raised for the first time in this court unless they concern obvious error which affects substantial rights of the juvenile, even though this is a trial de novo. Rule 52(b), N.D.R.Crim.P. To determine whether or not the error affected substantial rights, we examine "the entire record and the probable effect of the actions alleged to be error in light of all the evidence." *State v. Rindy, supra*, 299 N.W.2d at 785–86.

In order to determine whether or not substantial rights of Karen's were violated, we must review the entire record.

### IV. SUFFICIENCY OF THE EVIDENCE

■ The burden was upon the State to prove beyond a reasonable doubt that Karen committed the delinquent act of theft of lost or mislaid property. § 27–20–29(2), N.D.C.C. (proof beyond a reasonable doubt). Section 12.1–23–04, N.D.C.C., provides:

> "*12.1–23–04. Theft of property lost, mislaid, or delivered by mistake.*—A person is guilty of theft if he:
>
> 1. Retains or disposes of property of another when he knows it has been lost or mislaid; ...
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> and with intent to deprive the owner of it, he fails to take readily available and reasonable measures to restore the property to a person entitled to have it." § 12.1–23–04, N.D.C.C.

This definition requires a specific intent to deprive the owner. This intent is the very gist of the crime. As such it must be proved by the State.

We agree with what the Supreme Court of Minnesota said in *State v. Higgin*, 257 Minn. 46, 99 N.W.2d 902 (1959), when it held that intent could not be presumed from the defendant's actions thus placing a burden upon the defendant to rebut the presumption. The court said:

> "where specific intent is an essential element of the offense charged, it can never be presumed, at least in the sense that it *must* be found from a given state of facts in the absence of countervailing or rebutting evidence. Like every other essential element of the crime, specific intent must be established beyond reasonable doubt or be reasonably deducible from the evidence. It may not rest on a presumption. As previously mentioned, intent to defraud may be, and normally is, inferred from the established circumstances. But no matter how uncontrovertible the evidence of the intent to defraud may be, the court may not declare that the evidence establishes such intent." 99 N.W.2d at 907.

Thus, the State was required to prove that Karen's intent was to deprive the owner of the vest. Section 12.1–23–10(2)(c), N.D.C.C., defines "deprive" to mean:

> "(c) To dispose of property or use it or transfer any interest in it under circumstances that make its restoration, in fact, unlikely."

This intent to deprive is crucial. A person is not bound to take charge of an item he finds which he believes to be lost. If he does, however, he has the rights and obligations of a depository for hire. § 60–01–34, N.D.C.C. There is no requirement that the finder must take steps to find the rightful owner unless he knows or suspects who the owner is. § 60–01–35, N.D.C.C. Thus, the specific intent to deprive is what transforms the innocent act of taking charge of lost property, and not searching out the owner, into a criminal act.

Karen asserts that the evidence was insufficient to prove she committed the delinquent act of theft of mislaid property. Hearings held to determine delinquency under the Uniform Juvenile Court Act are to be conducted informally (§ 27–20–24, N.D. C.C.), but there must be sufficient, competent evidence to determine beyond a reasonable doubt that the delinquent act was committed by the juvenile.

A review of the transcript reveals that three persons testified. They were Ramona Huff, the petitioner, and the two police officers. None of the witnesses had any actual knowledge concerning the finding and disposal of the vest. All three witnesses testified that Karen had told them she had found the vest, worn it, and then left it at the high school gymnasium. The testimony also indicates that after Karen found the vest she hid it before going to the home of the woman for whom she babysat. The witnesses also testified that several of Karen's acquaintances had seen her wearing the vest. The only evidence concerning the disposal of the vest was that the witnesses all said Karen told them she left the vest at the gymnasium.

When all of this evidence is considered, a finding that Karen intended to deprive the owner of the vest by leaving the vest in the gymnasium becomes a very close and diffi-

cult determination. We would normally allow the juvenile court's decision to stand when, as required, we give its finding appreciable weight. On our review of the transcript, however, we cannot find sufficient, competent evidence to find beyond a reasonable doubt that Karen committed theft of mislaid property as defined by Section 12.1–23–04, when the hearsay evidence and Karen's statements given to the officers without being informed of her rights are excluded from consideration.

The relevant testimony of both police officers consisted solely of hearsay evidence or of the statements given to them by Karen.[4] This hearsay evidence was clearly a concern of the juvenile court judge as the judge questioned the officer as follows:

"Q  I missed the name of the person whom you talked to and you identified the person. It probably was another lady or girl. But I made a note that the witness says, or the person talking to you, told you that she saw [Karen] wearing the vest.

"What is the name of the person that told you that?

"A  Yes, that was [Linda].

"Q  [Linda]?

"A  Yes.

"Q  How old is [Linda]?

**4.** "Q  Did you ask [Karen] whether or not she had ever had the vest?

"A  Yes, I did. And she stated that she wore the vest to a wrestling tournament at the school where she had left it. And she stated she didn't have it any more.

"Q  Through your investigation were you able to determine whether anyone else had any part to do with this?

"A  As far as any part, as far as the investigation itself, I believe the only one that possibly had the vest was [Karen].

"Q  What do you base that on?

"A  I interviewed both [Joan] and [Linda]. [Joan] stated that she received one of the pins that was on the vest from [Karen]. And [Linda] stated that she had seen [Karen] wearing the vest. Also [Joan] stated that also."

The other police officer testified as follows:

"Q  Were you also present at this so-called meeting at the Sheriff's Office?

"A  Yes, I was.

"Q  Is there anything that you could add that Officer Wells may have forgotten?

"A  I had asked [Karen] why she had left the vest at the gymnasium up at the high school, and [Karen] stated she was afraid she would get in trouble. That is why she left it there.

"And as far as the people being present, I believe that the people present were [Linda], [Joan], [Karen], [Karen's] father [Joan's] mother, and I believe that [Linda's] mother was not there, but it was her father or her mother's friend. I am not sure who he was with her rather than the mother.

"Q  And you asked her or [Karen] this question:

"Why you left the vest? Was that after she had stated to you that she had indeed had the vest?

"A  Yes, it was.

"Q  Did she say any more as to who she would get in trouble with?

"A  No, she did not.

"Q  Have you ever seen the vest?

"A  No, I have not, sir."

"A Approximately 12—11, 12 years old.

"Q Roughly when was it that [Linda] told you this?

"A This was the night of the interview.

"Q Oh, the night when all of these people—

"A Yes, we had all subjects that were involved.

"Q Maybe a couple of weeks after the 29th?

"A Yes, approximately, yes."

As the testimony given by the officers was either hearsay evidence obtained by talking to Ramona and Karen's friends, or statements elicited by the officers when they questioned Karen without informing her of her rights, their testimony should not have been considered by the court in making its determination.

A review of Ramona's testimony reveals that a substantial amount of her testimony regarding control of the vest was hearsay evidence.[5]

When the testimony of the police officers is excluded, as is the hearsay evidence given by Ramona, we do not believe that sufficient evidence remains to determine that Karen intended to deprive the then unknown owner of the vest. To deprive means to dispose of the property under circumstances that make its restoration, in fact, unlikely.

Our review of the evidence does not convince us that the use of Karen's statements were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967).

In light of the fact that we cannot conclude that the juvenile court judge would have arrived at the conclusion that Karen committed the alleged delinquent act had the court not considered the inadmissible testimony, the decision of juvenile court must be and is hereby reversed.

The case is remanded for a rehearing before a juvenile court judge other than the one who heard this case initially. The designation of that judge shall be made by the presiding judge of the Northwest Judicial District.

SAND, PAULSON, PEDERSON and VANDE WALLE, JJ., concur.

---

5. "So we went over to Mrs. ... and who described the pin and identified it. And at that time, we asked her little girl where she had seen the vest.

"And at that time is when [Karen's] name came into the picture. She said, 'Yes, [Karen] had the vest and the other pin.'

"So we contacted [Karen]. And [Karen] gave back the other pin and denied having the vest.

"So we continued to ask [Karen] about it. And then she said a friend had it, which was [Joan].

"And after she found out we talked to [Joan], she said that she left it at the babysitter's, who was—... was their last name. And we checked into that. And the babysitter didn't know anything about it.

"And then she said that [Linda] had it, which she resides at the ....

"So we followed that up and talked to Mr. and Mrs. ... and [Linda]. And they said—[Linda] said she had seen [Karen] with it. And so did [Joan]. But [Linda] said she didn't have anything to do with it."