827 So.2d 647 (2002)
STATE of Louisiana
v.
Howard MOORE, Jr.
No. 02-302.
Court of Appeal of Louisiana, Third Circuit.
October 2, 2002.
*648 Terry W. Lambright, Assistant District Attorney, Leesville, LA, for State of Louisiana.
Edward Kelly Bauman, Louisiana Appellate Project, Lake Charles, LA, for Howard Moore, Jr.
Court composed of BILLIE COLOMBARO WOODARD, OSWALD A. DECUIR, and MICHAEL G. SULLIVAN, Judges.
SULLIVAN, Judge.
Defendant, Howard Moore, Jr., was indicted by a grand jury on one count of attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1(A)(1).[1] Defendant was fifteen years old at the time of the offense, but he was indicted as an adult.[2] After entering pleas of not *649 guilty and not guilty by reason of insanity, he requested the appointment of a sanity commission to report upon his capacity to proceed to trial as well as his mental condition at the time of the offense. After hearing the findings of the sanity commission, the trial court determined that Defendant had the capacity to proceed to trial. A jury found Defendant guilty of attempted manslaughter, and the trial court sentenced him to eight years at hard labor. Defendant now appeals his conviction and sentence, assigning three errors.

Facts
On September 20, 2000, Defendant and the nine-year-old female victim were at a church when Defendant dragged her into the woods, severely beat her with his hands and with a stick, and threw her against a tree. Defendant then went back to church, leaving the victim in the woods. When others discovered the victim was missing and asked Defendant if he had seen her, he denied any knowledge of her whereabouts. When the victim was eventually found, she told the deputies that a "black boy named Howard" had attacked her.

Assignment of Error No. 1
Defendant argues that the trial court erred in finding that he had the capacity to proceed to trial.
In State v. Howard, 98-64, pp. 3-4 (La.4/23/99); 751 So.2d 783, 791-792, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999) (footnote omitted), the supreme court stated the following regarding the standard of review for a trial court's finding regarding capacity to proceed:
Generally, a person who suffers from a mental disease or defect which renders him incapable of understanding the nature and object of the proceedings against him, of consulting with counsel, and of assisting in preparing and conducting his defense may not be subjected to trial. La.C.Cr.P. arts. 641-649.1; State v. Rogers, 419 So.2d 840, 843 (La. 1982), citing Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and State v. Bennett, 345 So.2d 1129 (La.1977). A defendant has the burden to establish his incapacity to stand trial by a preponderance of the evidence. Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (states may require the accused to prove his incompetency to stand trial only by a preponderance of the evidence; a higher standard of "clear and convincing evidence" violates the Due Process Clause); State v. Frank, 96-1136 (La.10/4/96), 679 So.2d 1365 (Cooper invalidates 1990 La. Acts No. 755, amending La.C.Cr.P. art. 648 to require a finding of incompetency by "clear and convincing evidence.") While the district court may receive expert medical testimony on point, the ultimate decision of competency is for the court alone. La.C.Cr.P. art. 647; Rogers, 419 So.2d at 843; State v. Edwards, 406 So.2d 1331, 1342 [(La.1981)]. "Moreover, the judge's determination of a defendant's present mental capacity is entitled to great weight and his ruling will be reversed only if it is clearly erroneous." Bennett, 345 So.2d at 1132. The determinations of the trial judge as to competency of defendant to stand trial are entitled to great weight on review and will not be overturned absent an abuse of discretion. State v. Brogdon, 426 So.2d 158, 167 (La.1983); State v. Rochon, 393 So.2d 1224, 1228 (La.1981).
In the present case, two psychiatrists, Dr. Aretta Rathmell and Dr. George Seiden, and one psychologist, Dr. John Simoneaux, submitted written reports and testified at the sanity commission hearing. Dr. Rathmell examined Defendant on January *650 23, 2001. In her report, Dr. Rathmell found that Defendant "currently has a rational as well as factual understanding of the proceedings against [him] and has a sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding." Dr. Rathmell also found no reason to believe that Defendant did not know right from wrong at the time of the alleged incident. Finally, Dr. Rathmell performed a Georgia Court Competency Test on Defendant and found his score to be 86. According to Dr. Rathmell's report, "[s]cores of 70 and above fall in the competency to stand trial range."
During Dr. Rathmell's testimony, defense counsel noted that her written report stated Defendant had an "isolated rage response, cause unknown." When asked to explain, Dr. Rathmell replied, "In layman terms it would mean a temper tantrum with some remorse afterwards."
Dr. Rathmell did not believe that the rage response caused Defendant any impairment or caused difficulty in his participation in his defense. Dr. Rathmell agreed that the Global Assessment of Functioning (G.A.F.) score she gave Defendant, 70, was higher than the G.A.F. score given by Dr. Seiden, 60. Dr. Rathmell also believed that Defendant was depressed because of the charges and because he felt his mother had betrayed him, but she did not believe that an official diagnosis of depression was warranted. When asked to explain the statement on her report that Defendant had poor judgment, Dr. Rathmell replied that some of his judgments were the result of immaturity. Finally, Dr. Rathmell stated that she did not agree with Dr. Simoneaux's recommendation that Defendant be hospitalized for observation over a period of time. On cross-examination, Dr. Rathmell stated that she thought the Defendant understood the proceedings against him and was able to assist his counsel.
Dr. Seiden examined Defendant on February 15, 2001. Based on his evaluation, Dr. Seiden concluded that Defendant had the ability "to consult with his attorney with a reasonable degree of rational understanding and currently has a rational and factual understanding of the proceedings against him." Dr. Seiden also found that all of the Bennett criteria were satisfied. Finally, Dr. Seiden concluded "with reasonable medical certainty, that at the time of the alleged offense, [Defendant] was not suffering from any mental disease or defect that rendered him incapable of distinguishing right from wrong with reference to the conduct in question."
At the sanity commission hearing, Dr. Seiden testified that he formed his opinion based upon his interview with Defendant and upon documents he received from the District Attorney's Office. According to Dr. Seiden, the most significant document he reviewed was a transcript of Defendant's September 20th interview. When asked how the interview helped him in forming his opinion, Dr. Seiden explained that Defendant initially claimed that he did not know why he was arrested and did not remember anything. After reviewing the transcript, in which Defendant recounted certain events, Dr. Seiden advised Defendant that his current claim of not remembering anything did not seem valid and that it would not be helpful to maintain that position. According to Dr. Seiden, Defendant was then able to remember, as Dr. Seiden believed he always was able to do.
When shown the statement in his report that Defendant was "currently suffer[ing] from adjustment disorder with anxiety and depression," Dr. Seiden testified that this disorder can cause impairment or distress, but that he did not believe it was severe *651 enough to interfere with Defendant's ability to proceed. Dr. Seiden was also asked whether Defendant's adjustment disorder would be affected by the stress of trial, and he replied that "trials are stressful for everybody involved for the most part, but, I don't think that it would be significant enough to interfere with his ability to proceed."
Although Dr. Seiden used the Bennett criteria when conducting his evaluation, he did not perform the Georgia Court Competency Test. When questioned about Defendant's G.A.F. score of 60, Dr. Seiden explained that a score of 60 is at the border between moderate to mild impairment or distress. Dr. Seiden further explained: "[H]e knows that he is facing some significant negative consequences, and, he is distressed by that, and, so, that's why I gave him that reading."
Dr. Seiden did not agree with Dr. Simoneaux's suggestion that Defendant be placed in a secure mental facility for observation, given that Dr. Simoneaux also suspected some form of malingering. Dr. Seiden testified that he found nothing to indicate that Defendant lacked the capacity to understand the proceedings or lacked the ability to assist counsel.
Dr. Simoneaux examined Defendant on January 29, 2001. In his report, Dr. Simoneaux noted that Defendant was relatively unresponsive and that he answered questions in a hesitant and confused manner. As Defendant's presentation was not consistent with that of a truly disturbed individual, Dr. Simoneaux made a provisional diagnosis of malingering. He thought it possible, though unlikely, that Defendant was seriously disturbed, and he considered Defendant unwilling, as opposed to unable, to assist his attorney. Although Dr. Simoneaux was willing to consider the possibility that with additional data he might decide that Defendant was more ill, his impression at that time was "that he is awkwardly trying to exaggerate symptoms in hopes that he can avoid future incarceration."
Aware that Defendant had given a statement when he was arrested, Dr. Simoneaux believed that the contents of that statement would have been helpful in assessing Defendant's mental status at the time. As Dr. Simoneaux wrote in his report, "His `amnesia' for these events is not convincing." Despite his clinical impression that Defendant was malingering, Dr. Simoneaux believed that his opinion about Defendant's capacity to proceed and his mental status at the time of the offense was inconclusive. He, therefore, recommended that Defendant be placed in a secure mental health facility for ninety days, where trained clinicians could determine if Defendant was truly disturbed at the level he claimed to be, as Dr. Simoneaux believed it would be impossible for someone to maintain a malingering stance for that long under such conditions.
Dr. Simoneaux also administered the Georgia Court Competency Test and found Defendant's score to be 68. Dr. Simoneaux stated that the score was a relatively low score and implied that Defendant may have difficulty understanding legal proceedings. However, Dr. Simoneaux qualified this conclusion by stating that it was difficult to know if that was a valid interpretation for an adolescent, particularly when he had the impression that Defendant may have been pretending to not understand to derive some secondary gain.
At the sanity hearing, Dr. Simoneaux explained that the problem with the Georgia Court Competency Test is that it was developed primarily for adults. Acknowledging that the difference between his score of 68 and Dr. Rathmell's score of 86 for the same test was surprising, Dr. Simoneaux *652 explained that Defendant was not very responsive to him and that he did not have the background information that the other doctors had. According to Dr. Simoneaux, he had no information except what he learned in a discussion with Defendant's attorney. Dr. Simoneaux explained that if he had access to the information that Dr. Seiden had, he probably would have proceeded in a similar fashion by confronting Defendant with his previous statements to challenge his lack of memory.
When questioned about his opinion that Defendant should be placed in a secure mental facility for further observation, Dr. Simoneaux noted his lack of additional information. He also believed that the gravity of the situation, in that Defendant was a young adolescent who could be "lost" if he went to prison, warranted further observation.
After hearing the testimony of the three doctors, the trial court rendered an oral ruling in which it noted that Dr. Rathmell and Dr. Sieden were quite conclusive in their opinions that Defendant had the capacity to proceed. The trial court also cited Dr. Simoneaux's testimony that it would have been helpful for him to have the information that Dr. Seiden did and that he did not disagree with Dr. Seiden's approach. Accordingly, the trial court concluded that the evidence clearly indicated that Defendant did have the capacity to proceed.
Noting the differences in the Georgia Competency Test scores given by Drs. Rathmell and Simoneaux, as well as Dr. Simoneaux's conclusion that Defendant needed further observation, Defendant argues that the trial court did not have sufficient information to determine that he was competent to stand trial. Considering the clear opinion of Drs. Rathmell and Seiden regarding Defendant's ability to stand trial and the cautionary position of Dr. Simoneaux regarding the need for further observation, we find that the trial court did not abuse its discretion in finding Defendant capable of proceeding.
This assignment of error lacks merit.

Assignment of Error No. 2
Defendant next argues the trial court erred in refusing to suppress a statement he made to police on September 20, 2000. On that date, Defendant was taken to the Sheriffs Office where he participated in an oral interview with Detective Marvin Hilton and then gave a tape-recorded statement.
Arguing that the statement was not voluntary, Defendant notes that he was only fifteen years old and only had a tenth grade education at the time. Defendant also claims that neither he nor his father were advised that he could be tried as an adult, that he was not given an opportunity to speak with his father alone, and that neither he nor his father were advised of the offense for which he was charged. Defendant further claims that he and his father were under stress when they signed the waiver form, that he had never been arrested before, and that he had never been shackled to a chair before. Defendant further argues that he gave his statement "not knowing that statement could be used against him as an adult when later charged with attempted second degree murder."
In State v. Maise, 00-1158, p. 12 (La.1/15/02); 805 So.2d 1141, 1150, the supreme court recently stated the following regarding the validity of a juvenile's statement:
The defendant was a juvenile at the time of his statement to Ms. Brown. "The confession of an accused of any age is valid only if it was given knowingly and voluntarily" State v. Fernandez, 96-2719 (La.4/14/98), 712 So.2d 485, 487. *653 The determination of whether a juvenile's incriminating statements are admissible is made on the totality of the circumstances surrounding the interrogation. Such circumstances include "evaluation of the juvenile's age, experience, education, background, and intelligence." Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).
During the hearing on the motion to suppress, Deputy Patrick Liliedahl testified that at approximately 7:30 on September 20, 2000, he responded to a call from a church regarding a missing child. Defendant had already gone home when Deputy Liliedahl arrived at the scene, so someone at the church called Defendant to return. Defendant returned to the church accompanied by his father. Although the deputy did not state what Defendant told him, Deputy Liliedahl testified that when Defendant arrived at the church, the deputy asked him if he had seen the victim and questioned him concerning her location when he last saw her. These questions were asked in front of the Defendant's father, who then assisted in the search for the child. When the child was found, she told the deputies that a "black boy named Howard" took her to the woods and beat her. As a result of the information disclosed by the child, Deputy Liliedahl detained the Defendant in his unit and read him his Miranda rights in the presence of his father. On cross-examination, Deputy Liliedahl stated that he advised Defendant that he was taking him to the office for questioning. No opportunity was given for Defendant and his father to talk privately. Defendant was transported to the Sheriffs Office, and his father followed in his own car.
Once at the Sheriffs Office, Defendant was placed in the dispatch room, which is a large open area, where his father joined him. While in the dispatch room, Defendant and his father were able to talk and converse with each other. The deputy estimated that they had longer than five minutes to talk with one another before Detective Hilton arrived. Deputy Liliedahl thought he remembered Defendant being handcuffed to the chair while in the dispatch room. Additionally, Deputy Liliedahl testified that he believed the Defendant's mother arrived a few minutes after Detective Hilton arrived. The deputy testified that before Defendant was questioned, he stated that he did not know anything and had no information to give.
Detective Hilton, the Chief Detective with the Vernon Parish Sheriffs Office, arrived at the Sheriffs Office at 10:08 p.m., where he saw Defendant and his father in the dispatch area. Because the log book indicated that Defendant was transported at 9:55 p.m., Detective Hilton did not believe Defendant and his father were together for very long. At trial, Detective Hilton testified that he did not believe Defendant was handcuffed. Detective Hilton asked Defendant and his father to accompany him to the detective section, a request that Defendant and his father agreed to without objection and without requesting the presence of an attorney. After Detective Hilton received general information from Defendant, the detective advised Defendant of his Miranda rights. Both Defendant and his father stated that they understood the rights form and both signed the form. They both signed the portion of the form that advised Defendant of his rights, as well as the portion of the form where Defendant actually waived his rights. Although the detective explained why Defendant was being questioned, Detective Hilton did not advise Defendant that he could be tried as an adult. Detective Hilton testified that he felt Defendant understood his rights.
*654 Detective Hilton then began an oral interview that lasted approximately thirty minutes. According to Detective Hilton, Defendant's father was present during the entire interview. The juvenile officer, Wayne Bailey, arrived just after the interview began and remained throughout the rest of the interview. Neither Defendant nor his father asked Detective Hilton to stop the interview or asked for an attorney to be present. When asked if he threatened, coerced or made any promises to the Defendant, Detective Hilton stated that he did not. Additionally, Detective Hilton did not remember Detective Bailey telling Defendant that it would be easier for him if he cooperated because Detective Bailey knew the judge.
After the interview, Defendant gave a tape-recorded statement that lasted about fourteen minutes. Defendant's father was present during the taped statement, and neither Defendant nor his father requested the statement to cease or requested the presence of an attorney.
The Defendant's father, Howard Moore, Sr., testified that at the time of the statement, Defendant was fifteen, had just started the tenth grade, could read and write, and averaged "C" grades. Although Defendant had never been arrested before, Mr. Moore remembered that his son had talked with military police. Mr. Moore also testified that he earned a Bachelor of Science Degree in Business Management from Howard University. Mr. Moore worked as a medical clerk at an army hospital and had served twenty-one years in the military, attaining the rank of Sergeant First Class.
At the hearing, Mr. Moore testified that his son was not advised of his rights when he was detained in the police unit and that he was not allowed to accompany his son to the police station. Mr. Moore also claimed that he was not able to talk with his son while they were walking to the police unit. When he arrived at the station, he found his son handcuffed and shackled to a chair. According to Mr. Moore, he was able to sit with his son only a second or two before Detective Hilton arrived and asked them to accompany him to his office. Mr. Moore remembered that the detective advised the Defendant of his rights and both he and his son signed the rights form. When asked what he believed he was allowing his son to do when he signed the form, Mr. Moore stated, "Basically I was allowing him to, you know, if he wanted to make a statement to let, you know, to allow him to go ahead on." However, when asked if he understood the rights the detective read to him, Mr. Moore responded that he was more concerned with the condition of the victim at the time and that he otherwise would not have signed the waiver.
According to Mr. Moore, he was not informed of the offense for which Defendant was being accused or that Defendant could be tried as an adult. If he had known that Defendant could be tried as an adult, Mr. Moore testified that he would not have let Defendant give a statement without an attorney being present. Mr. Moore remembered Detective Bailey telling them that he knew the judge and that if Defendant cooperated, he would make things easy. Mr. Moore further testified that he did not believe his son understood what he was doing.
Defendant also testified at the motion to suppress hearing. He stated that he was fifteen at the time he gave his statement, that he had just started the tenth grade, that he could read and write, and that he made "C's and below" in school. Defendant testified that before this incident, he had never been in a police station and had never been arrested. Although he was not a suspect, Defendant was questioned as a *655 witness on a prior occasion by the military police. Defendant stated that after the victim was found, Deputy Liliedahl handcuffed him and started walking him to the police unit. According to Defendant, his father was present when he was placed in the cuffs, but he was not advised of his rights. When Defendant was brought to the police station, he was handcuffed and shackled to a chair. His father was in the room only a few seconds before Detective Hilton arrived, so he did not have an opportunity to discuss things with his father. Apparently, before Defendant went into Detective Hilton's office, his cuffs and shackles were removed.
Although Defendant remembered being read his rights prior to the interview, he did not remember Detective Hilton explaining the rights to him. Defendant claimed that he signed the rights form even though he did not understand it. Although Defendant knew the interview was about the victim, he did not know what he was being charged with and he did not know that he could be tried as an adult. Defendant claimed that he would not have made the statement if he had known he could be tried as an adult and if he would have been told not to do so by his father. Defendant again stated that he was never given an opportunity to talk with his father alone. Defendant also claimed that Detective Bailey told him he needed to cooperate because things would be easier for him. Finally, Defendant stated that his father was present during the interview and statement and that he was never threatened, intimidated, or promised anything by Detective Hilton. Neither the Defendant nor his father stopped the statement to talk privately or to retain an attorney.
After hearing the above testimony and argument by defense counsel, the trial court found that Defendant's statements were voluntarily and intelligently given. The trial court noted that, at all times, Defendant, who was an average tenth grade student, was in the presence of his father, an educated man with twenty-one years in the military. While Defendant may not have understood every term that was read to him, the trial court found no reason why his father did not. The trial court found that Defendant's father was seriously concerned about the victim, but that this concern did not excuse him from paying attention to what was going on with his son. Essentially, the trial court found that the father had the education, experience, and intelligence to either request an attorney or to speak privately with his son.
Under the totality of the circumstances presented in this case, we find that the State has met its burden of proving that Defendant's statement was voluntarily and intelligently made. Defendant was beginning the tenth grade, made average grades, and could read and write. Defendant's father, an educated man, was present during the interview and tape-recorded statement. Although Defendant and his father claim Detective Bailey said the judge would be easier on Defendant if he made the statement, the detective specifically denied making such a statement. Defendant also stated that Detective Hilton never threatened, intimidated, or promised him anything in exchange for his statement. Further, after listening to the tape-recorded statement, we find nothing that indicates Defendant was being coerced, threatened, or forced into giving the statement. On the tape, Detective Hilton said they were present as a result of an earlier incident in which Defendant allegedly beat and kicked a nine-year-old girl. Detective Hilton then asked both Defendant and his father if Defendant had been advised of his Miranda rights, understood the rights, and agreed to waive the rights. Defendant and his father responded affirmatively, and Defendant's father *656 stated that he was present during the advice of the rights and the waiver of the rights. Defendant's father also agreed that he was giving his permission and consent for Defendant to give a statement.
Although Defendant claims that he was not told he could be charged as an adult, he fails to cite any jurisprudence that requires a juvenile to be advised as such. Defendant also claims that he was not told of the charges against him, but again he cites no jurisprudence that this was required before a juvenile gives a statement. Moreover, Defendant stated that he knew of the circumstances for which he was being questioned. Since the offense was still being investigated, formal charges had not been brought.
Defendant also claims he was not given a chance to talk with his father in private. Although there is some question as to how long Defendant was able to talk with his father while in the dispatch room at the police station, the requirement of State in the Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978), that the juvenile engage in a meaningful consultation with an interested adult before making a statement was overruled in State v. Fernandez, 96-2719 (La.4/14/98); 712 So.2d 485. Even under Dino, however, a private consultation was not a prerequisite. State v. Gachot, 609 So.2d 269 (La.App. 3 Cir.1992), writ denied, 617 So.2d 1180 (La. 1993), cert. denied, 510 U.S. 980, 114 S.Ct. 478, 126 L.Ed.2d 429 (1993). Finally, there is no indication, other than Defendant's and his father's testimony, that the Defendant failed to understand the rights he was waiving by making a statement.
This assignment of error lacks merit.

Assignment of Error No. 3
Defendant argues that his eight-year sentence is excessive, as he is a young, first-time offender who is in need of mental health treatment.
Defendant was originally charged with attempted second degree murder, but the jury returned a verdict of attempted manslaughter. The penalty provision for the completed offense of manslaughter calls for imprisonment at hard labor for not more than forty years. Since Defendant was convicted of attempted manslaughter, the maximum penalty he could have received was twenty years at hard labor. After a sentencing hearing, the trial court sentenced Defendant to eight years at hard labor. Before imposing sentence, the trial court noted the facts of the case as well as the injuries sustained by the nine-year-old victim, including a skull fracture, spleen and kidney injuries, and multiple contusions to the head and neck area. The trial court also noted that it had reviewed the pre-sentence investigation report, heard the testimony introduced at the sentencing hearing, received letters from various individuals, and had reviewed the reports from the doctors who participated in the sanity commission, as well as reports from doctors who had treated or examined the Defendant.
In imposing sentence, the trial court considered that the young victim's injuries could have been life-threatening had she remained in the woods for a longer period of time. The trial court also noted that Defendant offered no excuse for his conduct, other than the victim getting on his nerves and making him angry, and that Defendant compounded his actions by initially denying knowledge of the incident when his information could have gotten aid to the victim sooner. The trial court considered the unprovoked nature of the attack as evidence that Defendant has serious impulse control problems that had not been addressed by the time of sentencing. Because Defendant was bigger and stronger *657 at the time of sentencing, the trial court found him more capable of harming people than he was at the time of the offense. Although numerous people had come forward pleading for probation, the trial court found a sentence of incarceration was mandatory because Defendant committed a crime of violence. In imposing the eight-year sentence, the trial court urged the Department of Corrections to address Defendant's psychological problems with inpatient treatment while he was in its custody.
According to the pre-sentence investigation report, even the victim's parents felt that Defendant should be placed in a mental institution rather than in prison. However, as noted by the trial court, such an option was not available. Defendant was found guilty of attempted manslaughter, a crime of violence as defined in La. R.S. 14:2(13)(d). As such, suspension of sentence was prohibited by La.Code Crim.P. art. 893(A). Thus, the trial court was required to impose a term of imprisonment. The trial court did, however, recommend that Defendant receive some type of psychological treatment while in prison.
As stated by the supreme court in State v. Cook, 95-2784, p. 3 (La.5/31/96); 674 So.2d 957, 959, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996), "The only relevant question on review ... [is] `whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.' State v. Humphrey, 445 So.2d 1155, 1165 (La.1984) (citing State v. Williams, 412 So.2d 1327 (La.1982))." Considering the ample reasons given by the trial court and the serious injuries sustained by the victim, we find no abuse of discretion in the eight-year sentence imposed.
This assignment of error lacks merit.

Errors Patent
In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we have found none.

Decree
For the above reasons, Defendant's sentence and conviction are affirmed.
AFFIRMED.
NOTES
[1] Defendant was charged in a separate docket number with second degree kidnapping.
[2] Because Defendant was indicted as an adult, his initials have not been used. Furthermore, any juvenile proceedings could have been open to the public pursuant to La.Ch.Code art. 879(B).