# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## JAK 09-67


**STATE IN THE INTEREST OF**

**J.E.T.**


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 21511
HONORABLE LILYNN ANNETTE CUTRER, DISTRICT JUDGE

**********

## JOHN D. SAUNDERS
## JUDGE

**********

Court composed of John D. Saunders, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

**REVERSED AND REMANDED.**

John Foster DeRosier
14th JDC District Attorney
Carla Sue Sigler
Assistant District Attorney
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
Counsel for Plaintiff/Appellee:
State of Louisiana

Annette Fuller Roach
Louisiana Appellate Project
P. O. Box 1747
Lake Charles, LA 70602-1747
(337) 436-2900
Counsel for Defendant/Appellant:
J.E.T.

**SAUNDERS, Judge.**

A delinquency petition was filed against J.E.T. (hereinafter "the Juvenile") on May 14, 2008, alleging that he committed aggravated incest, a violation of La.R.S. 14:78.1. On August 1, 2008, the Juvenile's motion to suppress was taken up and subsequently denied. The Juvenile then opted to enter an *Alford/Crosby* plea to the charge.[1] At that time, the Juvenile was placed on temporary probation pending the disposition hearing. The final disposition hearing was held on October 24, 2008, wherein the Juvenile was placed on probation with several conditions of probation, not to exceed his eighteenth birthday. He was also placed in the custody of his grandmother.

The Juvenile appealed the denial of his motion to suppress and is now before this court, asserting seven assignments of error involving the denial of his motion to suppress, his admission, and his disposition. We find that the Juvenile's adjudication should be reversed.

**FACTS:**

The Juvenile's delinquency adjudication was the result of a guilty plea. A factual basis was not provided by the State at the time of his plea, and the following facts were taken from the hearing on the Juvenile's motion to suppress held just prior to his guilty plea.

On or about May 5, 2008, at about 9:30 p.m., the Juvenile's stepfather, J.M., was bathing with the victim, his three-year-old daughter, when she reported that the Juvenile, her half-brother, had touched her "coochie," referring to her vagina. J.M. informed A.D.M., who is his wife, and the victim's mother, and also the Juvenile's

---

[1]A juvenile may enter such pleas. *State ex rel. K.H.*, 98-632 (La.App. 5 Cir. 12/16/98), 725 So.2d 583.

mother. J.M. and A.D.M. subsequently questioned the Juvenile, who denied purposefully touching the victim. J.M. and A.D.M. remained concerned, however, because the Juvenile's responses were inconsistent, and they decided to contact the sheriff's office to report the offense.

A sheriff's deputy went to their house that night at about 1:00 a.m. but did not question the Juvenile or arrest him. On May 8, 2008, the victim was taken to the Child Advocacy Center to be interviewed. Afterwards, J.M. and A.D.M. brought him to the sheriff's office for his first recorded interview, but he denied the allegation. Later that day, detectives questioned the Juvenile at his residence, and he admitted to improperly touching the victim at that time. Detectives then transported the Juvenile in their patrol car to the sheriff's office for a second recorded interview. During his second interview, the Juvenile admitted again to improperly touching the victim. The Juvenile was then arrested and taken to the juvenile detention center.

**ASSIGNMENT OF ERROR NO. 1:**

In his first assignment of error, the Juvenile argues that the trial court's ruling which denied his motion to suppress is flawed for several reasons: 1. the lack of understanding by the eleven-year-old Juvenile; 2. an adult interested in his welfare was not present with the Juvenile during each questioning to assist him in understanding the consequences of a waiver of his rights; 3. a proper waiver of rights was not obtained prior to the Juvenile's statement made at his home; and, 4. the Juvenile's second recorded statement was improperly induced by threats, coercion, and intimidation.

Pursuant to the free and voluntary rule set forth in La.R.S. 15:451, before a purported confession can be introduced in evidence, the State must show "[t]hat it

2

was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." Also, as noted in *State v. Terrick*, 03-515, pp. 9-10 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1159, *writ denied*, 03-3272 (La. 3/26/04), 871 So.2d 346,

> Before introducing a defendant's statement into evidence, the state must show that the statement did not result from fear, duress, intimidation, menace, threats, inducements or promises. LSA-R.S. 15:451; *State v. Lucky*, 96-1687, p. 26 (La.4/13/99), 755 So.2d 845, 855, *cert. denied*, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000). Moreover, at the hearing on a motion to suppress a statement, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the statement. LSA-C.Cr.P. art. 701.

> The constitutional privilege against self-incrimination and the right to counsel apply equally to juveniles and adults. *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967);[2] *State in the Interest of D.J.*, 01-2149, p. 10 (La.5/14/02), 817 So.2d 26, 30. Thus, if the accused is in custody at the time of the statement, he must also have first been advised of his constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

> The determination of whether a waiver of constitutional rights is knowing and voluntary is made on a case-by-case basis and such a determination rests upon the "totality of the circumstances." *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197, *reh'g denied*, 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979); *State v. Fernandez*, 96-2719, p. 7 (La.4/4/98), 712 So.2d 485, 487.

In *State v. Fernandez*, 96-2719, p.10 (La. 4/14/98), 712 So.2d 485, 489, our supreme court stated, "[a] confession by a juvenile given without a knowing and voluntary waiver can be, and should be, suppressed under the totality of circumstances standard applicable to adults, supplemented by consideration of other very significant factors relevant to the juvenile status of the accused."[3] Additionally,

---

[2]The correct name is *Application of Gault*. However, we note that the case is frequently referred to as *In re Gault* in the jurisprudence.

[3]The ruling in *Fernandez* overruled *State in the Interest of Dino*, 359 So.2d 586 (La.1978), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722 (1978) and reinstated the totality of the circumstances standard that prevailed prior to the *Dino* decision. Pursuant to

"special needs of juveniles in this regard are analogous to the special need of individuals with mental deficiencies which are simply factored into the totality of the circumstances." *Id.* at 489. "Such circumstances include 'evaluation of the juvenile's age, experience, education, background, and intelligence.' *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)." *State v. Maise*, 00-1158, p.12 (La. 1/15/02), 805 So.2d 1141, 1150.

In the instant case, evidence of the Juvenile's age is shown in two Juvenile Miranda Forms for Interrogation signed by both the Juvenile and either his mother, A.D.M., or his stepfather, J.M., which were submitted into evidence. The forms reflect that the Juvenile was born on May 1, 1997, and, thus, he was eleven years old at the time of his interview on May 8, 2008.[4] The forms also indicate that the Juvenile was in the fourth grade at the time of his interviews.[5]

At the hearing on the motion to suppress, the State relied upon the testimony of J.M., A.D.M., and Detectives Jason Alexander and Michael Primeaux to show that the Juvenile knowingly and voluntarily waived his rights prior to confessing. Although the Juvenile's two interviews were recorded, neither the tapes nor transcribed statements were offered into evidence.

---

*Dino*, a "purported waiver by a juvenile must be adjudged ineffective upon the failure by the State to establish any of three prerequisites to waiver, viz., that the juvenile actually consulted with an attorney or an adult before waiver, that the attorney or adult consulted was interested in the welfare of the juvenile, or that, if an adult other than an attorney was consulted, the adult was fully advised of the rights of the juvenile." *Id.* at 594.

[4]We note that one form is not timed and dated and is purported to be the form signed by the Juvenile and A.D.M. prior to his first interview. A.D.M. identified the document at the hearing, as well as her signature and that of the Juvenile.

[5]Following the acceptance of the Juvenile's plea, the court proceeded with a partial disposition. Counsel for the Juvenile stated that the Juvenile would be entering middle school and would not be going to school with younger children.

The testimony indicates that J.M. is the Juvenile's stepfather and the biological father of the three-year-old victim. J.M.'s wife, A.D.M., is the mother of both the Juvenile and victim. According to J.M., after the victim was interviewed at the Child Advocacy Center, the Juvenile was questioned for the first time by Detective Alexander at the sheriff's office. The Juvenile was interviewed in the presence of A.D.M., while J.M. remained in the waiting room.

According to A.D.M., the Juvenile was advised of his *Miranda* rights, and he understood the nature of the questions. A.D.M. testified that the Juvenile was not threatened or physically forced to say anything, and she did not feel that intimidation was used during the interview. A.D.M. stated that the Juvenile denied the allegation, as he had done before when questioned at home. The Juvenile's answers were vague and inconsistent.

J.M. testified that the Juvenile's second interview on May 8, 2008, occurred after he and A.D.M. called Detective Alexander to report that J.M.'s friend, D. M., was concerned about the safety of his own daughter while the Juvenile was staying in their home pending the investigation. According to J.M., D.M. reported that the Juvenile had roamed around his house that night and had entered his daughter's room. Although nothing happened, D.M. felt awkward about the situation and was concerned that something would happen. J.M. stated that D.M. was a friend and that he knew everything that was going on with the Juvenile.

Next, J.M. testified that Detectives Alexander and Primeaux went to their home and spoke with him and A.D.M. Detective Alexander then pulled the Juvenile to the side and questioned him. When they finished questioning him, J.M. and A.D.M. were told that the detectives were going to take the Juvenile in and that they would like to

5

have another interview. J.M. and A.D.M. allowed the detectives to transport the Juvenile in their squad car, and they followed behind in their own vehicle.

The Juvenile was then interviewed a second time, in the presence of J.M. According to J.M., A.D.M. did not want to sit in on the interview because she was stressed and was unsure of how she would react. A.D.M. stated that she knew both detectives would be questioning the Juvenile and that they would press him even harder, possibly eliciting statements that she did not want to hear.

According to J.M., the Juvenile was advised of his *Miranda* rights and then confessed to patting and touching the victim's vagina. J.M. explained that the Juvenile was given a teddy bear to demonstrate how he touched the victim, and then the interview "got down to the nitty-gritty at that time." J.M. testified that the detectives did not get rough, but "were getting to the point," as they did not believe the Juvenile was telling the truth. J.M. observed that Detective Primeaux "used a deep voice," but nothing that he thought would scare the Juvenile. J.M. later admitted that the detectives cursed at the Juvenile and told him to "tell the truth or else." J.M. confirmed that the Juvenile was not handcuffed and that the detectives did not throw him around, throw water in his face, or use similar tactics during the interview. J.M. also denied threatening the Juvenile at any point, despite the fact that he was the victim's father.

J.M. also testified that Detective Primeaux scared the Juvenile by turning off the lights in the interrogation room. According to J.M., when Detective Primeaux asked the Juvenile if he had compared his size to that of the victim, the Juvenile responded by saying something to the effect that he was a big boy and could handle himself. To show that the Juvenile was not as big as he thought, Detective Primeaux

6

asked J.M. to hold the door knob from the outside and then he turned off the lights in the room. J.M. stated that when Detective Primeaux turned the lights back on, the Juvenile was crouched down in a corner, to the detective, the Juvenile was thinking that someone was coming after him.

J.M. admitted that Detective Primeaux was intimidating the Juvenile at this point, but stated that very little questioning occurred afterwards. He was not certain, however, if the Juvenile was questioned at all after the incident. Shortly thereafter, A.D.M. went into the room, and then they were given time to talk to the Juvenile before he was taken into custody.

A.D.M. testified that after the two-hour interview, the Juvenile appeared shaken, but not harmed in any way. She was not aware, however, that the lights had been turned off to teach the Juvenile a lesson. A.D.M. also stated that she would have objected to such treatment. The Juvenile was then arrested and taken to the juvenile detention center.

On cross-examination, A.D.M. testified that there was friction on occasion between the Juvenile and J.M. A.D.M. admitted that J.M. thought the Juvenile had not been brought up right. Also, A.D.M. stated that the Juvenile, if pressured, would say things that he believed people in authority, including J.M., would want to hear to end the pressure.

Detective Alexander testified that he first spoke with J.M. and A.D.M. at the Children's Advocacy Center and took written statements from them at that time. The Juvenile was brought in voluntarily by J.M. and A.D.M. the following day to be interviewed. According to Detective Alexander, he reviewed the Juvenile's *Miranda* rights with the Juvenile and his mother and confirmed their understanding of same.

7

Detective Alexander added that they did not request an attorney and agreed to the interview. During the one-hour interview, the Juvenile denied the allegation. He admitted, however, to accidentally touching the victim's vagina on a few occasions when helping her to pull up her panties or when changing her diaper.

According to Detective Alexander, he was contacted later that same day by J.M., who informed him that the Juvenile had admitted to lying and had, in fact, touched the victim. J.M. also reported that the Juvenile, while staying in the home of D.M., had gone into the room of D.M.'s daughters the previous night. Detectives Alexander and Primeaux then went out to the D.M.s' home and spoke with J.M. and A.D.M. Detective Alexander testified that J.M. and A.D.M. gave detectives permission to speak with the Juvenile. After reading the Juvenile's *Miranda* rights from a card in front of his mother, Detective questioned the Juvenile. Detective Alexander maintained that everyone understood the *Miranda* rights. When he asked the Juvenile if had something to tell him, the Juvenile admitted to Detective Alexander that he had lied and that he had been touching his sister.

Detective Alexander stated that the Juvenile did not make his admission in front of J.M. and A.D.M., but he recalled that his mother was nearby. A.D.M. testified, nonetheless, that she did not hear the Juvenile's admission, explaining that she was standing away from the Juvenile with Detective Primeaux and J.M., who were engaged in a discussion.

Detective Alexander testified that he stopped questioning the Juvenile at that time and then sought J.M. and A.D.M.'s permission to interview the Juvenile a second time at the sheriff's office. The Juvenile was then transported by the

8

detectives to the sheriff's office, and J.M. and A.D.M. followed behind. The Juvenile was not under arrest at that time.

Detective Alexander stated that the Juvenile was not questioned during transport, and he denied making any statements to the Juvenile. On cross-examination, Detective Alexander testified that Detective Primeaux may have spoken to the Juvenile while in the car, but he did not hear Detective Primeaux threaten the Juvenile or tell the Juvenile that he wanted to hit him because he was lying.

Prior to interrogating the Juvenile, detectives spoke with J.M. and A.D.M. outside of the Juvenile's presence. At that time, A.D.M. stated that she did not want to go into the interview room and that J.M. would be attending the interview. According to Detective Alexander, J.M. was neither angry nor happy and asserted that J.M. did not threaten the Juvenile in any way. During the two-hour interview, the Juvenile subsequently admitted to touching the victim and reported that he had urges and desires. The Juvenile was given a teddy bear to demonstrate how he had touched the victim in the vaginal area. Detective Alexander maintained that the Juvenile was not threatened or coerced in any way.

Next, Detective Alexander testified that Detective Primeaux turned the lights off in the interrogation room after the interview had concluded and the recording had stopped. Detective Alexander explained that he and J.M. left the interview room and entered an adjacent room which had a two-way mirror between the rooms. Detective Primeaux then turned off the lights for less than a minute. According to Detective Alexander, the Juvenile did not cry out or scream.

Detective Primeaux testified that he accompanied Detective Alexander to the Juvenile's residence on May 8, 2008, to speak with J.M. and A.D.M. After Detective

9

Alexander spoke with them, he *Mirandized* the Juvenile and then questioned him. Detective Primeaux denied threatening the Juvenile by grabbing, choking, or throwing him against the car. After the Juvenile admitted to touching the victim, J.M. and A.D.M. agreed to return to the sheriff's office. The detectives transported the Juvenile in Detective Primeaux's unit while his family followed.

Detective Primeaux asserted that he did not talk to or threaten the Juvenile on the drive to the sheriff's office. Detective Primeaux admitted, however, to "joking" with Detective Alexander about stopping and hitting the Juvenile, but stated that he never had any intentions of following through. On cross-examination, Detective Primeaux denied that he was being coercive, despite the fact that the eleven-year-old Juvenile was in the car with two officers, one of whom was joking about stopping the car and hitting him. Detective Primeaux maintained that the conversation was between himself and Detective Alexander.

Next, Detective Primeaux was asked:

Q    Did it seem like [the Juvenile] would have any reason to forget that in a ride between Moss Bluff and the Sheriff's Office?

A    The statement that I made didn't start at the residence and didn't stop at the Sheriff's Office. It happened during the course of our travel to the Sheriff's Office, and there wasn't [sic] prolonged as far as 15-20 minutes the entirety of the trip. It happened 10 or 15 seconds.

Q    But to an 11-year-old, that would have been a pretty striking 10 or 15 seconds, wouldn't it?

A    It's been a long time.

Q    Having a police detective joke about hitting him?

The State then objected to the speculative nature of the question and the line of questioning ended.

10

Detective Primeaux testified that after their arrival at the sheriff's office, A.D.M. gave J.M. permission to sit in on the Juvenile's second interview. According to Detective Primeaux, J.M. did not appear angry. Detective Alexander then presented a juvenile *Miranda* form to the Juvenile and J.M. and completed the form in J.M.'s presence. Detective Primeaux testified that they never requested an attorney. Detective Primeaux admitted that he advised the Juvenile that he did not believe he was telling the truth and that the Juvenile knew "in no uncertain terms" that he was serious. He did not recall crumpling up a cup and throwing it at the Juvenile, but admitted that it could have happened. Detective Primeaux also denied threatening the Juvenile with bodily harm.

Detective Primeaux also admitted to turning off the lights in the interview room after the interview concluded. He explained that the Juvenile had cried a little at one point in the interview, stating that he knew what he had done was wrong. Because this was the only time during the interview the Juvenile showed remorse, Detective Primeaux expressed to J.M. that he had serious concerns about the Juvenile's attitude and demeanor. When J.M. and Detective Alexander stepped out of the room, Detective Primeaux turned off the lights for ten to fifteen seconds.

On cross-examination, Detective Primeaux stated that he was not joking when he turned off the lights. He explained that some suspects "play hardball" and act like they are bad, but when something goes wrong, such as turning off the lights, they start to cry. Detective Primeaux opined that the eleven-year-old Juvenile was playing hardball and was not willing to come forth with the suspected information. Detective Primeaux admitted that he had not been trained to perform such tactics and that he

11

had come up with the tactic on his own. He also admitted that he was not trained to joke about harming a suspect.

In rendering its decision, the trial court stated:

THE COURT:

Let me say this: after hearing all the evidence a couple of things. One, I think with regards to it being the step-father, I think he's been his father for a long time. But more importantly I think the mother gave permission for that and I don't think -- if she didn't want to go in that's fine but she can't authorize somebody to act on her behalf and then change her mind. But there's no indication that he did anything inappropriate anyway.

The incident about the lights, I don't know what I think about it but I think the testimony indicates it was done at the end. Everybody has testified that it was done after the statement had already been given. So I don't think it would have any effect on the statement.

The parents consented to him riding in the car. I don't know how he would have taken the joking around or not, but I think when he got to the station and his mother and his step dad, and his step-dad was in there. Everybody's testified that there was no threats or anything in that interview. He had already -- the parents were the ones who called law enforcement back out the second time and he acknowledged to law enforcement at that time that he lied and wanted to basically change his statement.

So for all those reasons the Court's going to deny the Motion to Suppress.

Louisiana Children's Code Article 808 provides, "[a]ll rights guaranteed to criminal defendants by the Constitution of the United States or the Constitution of Louisiana, except the rights to jury trial, shall be applicable in juvenile court proceedings brought under this Title." In the Louisiana Children's Code Handbook, the Authors' Notes regarding La.Ch.Code art. 808 address juvenile confessions and discuss the associated inherent problems as follows:

As early as 1948, the United States Supreme Court warned that admissions and confession of juveniles must be voluntary and require special caution. In Haley v. Ohio, 332 U.S. 596, 599-600 (1948), the

12

court reversed a conviction of a fifteen-year-old for murder and observed, "[W]hen, as here, a mere child – an easy victim of the law – is before us, special care in scrutinizing the record must be used . . . [The youth] needs counsel and support if he is not to become the victim first of fear, then of panic.  He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him".  See also, Gallegos v. Colorado, 370 U.S. 49 (1962) (reversing the conviction, finding a fourteen-year-old's confession inadmissible.)  In In re Gault, 387 U.S. 1, 55 (1967), the court held that the constitutional privilege against self-incrimination is applicable in juvenile proceedings "as it is with adults," (p. 55) and required clear and unequivocal evidence that the admission was made with the knowledge that the juvenile was not required to speak nor would he or she be penalized for maintaining silence. . . .

Further, the court specifically rejected the argument that confession "is good for the child as the commencement of the assumed therapy of the juvenile court process", noting that there was no proof of the linkage between them.  Indeed, the court speculated: "[W]here children are induced to confess by 'paternal urgings' on the part of officials and the confession is then followed by disciplinary action, the child's reaction is likely to be hostile and adverse – the child may feel that he has been led or tricked into confession and that despite his confession, he is being punished" (p. 51).

> . . . .

If a juvenile accused has been given *Miranda* warnings, the issue then arises of whether she or he is a presumptively capable as is an adult of waiving the privilege against self-incrimination and the right to the assistance of counsel.  Since Gault had not been advised of his privilege, waiver was not at issue, though the United States Supreme Court in dictum acknowledged that some distinction might be necessary to accommodate the diminished capacity of some accused children:

> We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique – but not in principle – depending upon the age of the child and the presence and competence of parents. The presence of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege.  If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or

13

of adolescent fantasy, fright or despair. (In re Gault, 387 U.S. 1, 55 (1967).)

Can a juvenile unilaterally waive these rights? If not, must he or she be assisted by counsel during interrogation or would a parent or some other trusted adult suffice as a counselor?

. . . .

The question of the adequacy of parental assistance during waiver decision-making is troublesome. Certainly a parent may be a trusted confidant, but there is an inherent conflict of interest between the parental role and the legal advisor role. State v. Hudson, 404 So.2d 460 (La.1981) illustrates this issue. There when parental consultation was provided, the parents urged their son to tell the truth about the murder of which he was accused. They did not and probably could not fully alert him about the consequences of a confession in legal proceedings. They spoke in their role as moral guardians rather than as legal counselors. The court affirmed the adjudication. Ironically, the inadequacy of the "Dino rule" – parental consultation in safeguarding juvenile waivers – was highlighted in the court's reasons for judgment: "If parents' advice to tell the truth requires exclusion of a juvenile's confession, then virtually no guilty juvenile will ever be convicted on a confession given after consultation with parents" (p. 464).

Lucy S. McGough and Kerry Triche, *Louisiana Children's Code Handbook*, 372-76 (2007).

With the inherent problems associated with a juvenile's waiver of rights in mind, the factors which the Juvenile contends to have contributed to his waiver are individually addressed.

**Age**:

Appellate counsel questions the eleven-year-old Juvenile's ability to comprehend his rights and correctly asserts that the trial court did not discuss his age and the possible effect it may have had on his ability to comprehend his rights. Also, there was no discussion as to the Juvenile's level of intelligence. As noted in *Maise*, 805 So.2d 1141, these circumstances are significant factors in determining whether a juvenile's confession was given with a knowing and voluntary waiver.

A review of Louisiana jurisprudence involving juvenile waivers did not reveal any cases involving a juvenile eleven years old or younger or a juvenile with only a fourth grade education. Also, the jurisprudence has no "magical age" which, in itself, suggests that a juvenile is not capable of understanding the waiver of rights.[6]

The case law is clear, however, that the Juvenile's young age in the instant case, considered alone, is not sufficient reason to exclude his admission. In *State ex rel. Lewis*, 99-960 (La.App. 4 Cir. 6/30/99), 737 So.2d 962, the admission of a thirteen-year-old defendant, made in the presence of his mother, was not excluded based on his age. The appellate court found that the trial court erred in effectually taking "judicial notice of the fact that a thirteen year old cannot understand a waiver of rights form" and in refusing to give any weight to the presence of the defendant's mother. *Id.* at 963. As such, *Lewis* indicates that a juvenile just on the edge of his teen years is not automatically considered to lack the ability to understand a waiver of rights and that the Juvenile's young age is just one consideration in determining his ability to understand.

**Interested/Competent Adult**:

The Juvenile also complains that an adult interested in his welfare was not present with him when he was questioned to assist him in understanding the consequences of a waiver of his rights. As noted in *State v. Harper*, 07-299, p.18 (La.App. 1 Cir. 9/5/07), 970 So.2d 592, 604, *writ denied*, 07-1921 (La. 2/15/08), 976 So.2d 173, "[t]here is no absolute requirement that an attorney or guardian must be present with a juvenile suspect at the time he makes the statement."

---

[6]Pursuant to La.Ch.Code art. 804(3), a child must be ten years of age or older for his acts to be considered delinquent. The age at which a child is deemed capable of understanding the waiver of rights is not provided in the code.

15

The presence of an interested adult, like age, however, is a factor to consider. *Maise*, 805 So.2d 1141. Additionally, the facts of this case present an unusual situation in that J.M. and A.D.M. have an obvious conflict of interest as the mother and father of the victim. As such, the Juvenile's argument that an interested adult was not present when the Juvenile was questioned may have merit. In *State v. Belton*, 525 So.2d 77 (La.App. 3 Cir. 1988), the juvenile defendant's probation officer of three years served as a concerned adult because his mother was in prison, his father's whereabouts were unknown, and his elderly grandmother with whom he lived was blind. After being advised of his rights and discussing them with his probation officer, the defendant admitted to several offenses. On appeal, the defendant argued that his probation officer was not sufficiently independent to serve as someone interested in his welfare, and even if she did suffice as the adult counselor, the consultation provided was not adequate. The court agreed and found that the defendant's probation officer was not considered to be an adult concerned about his welfare.

In reaching this decision, the *Belton* court observed that a court may presume that a parent is an interested adult in the welfare of a juvenile, but that the presumption can be negated if the parent is found to lack concern for the child's welfare necessary to genuinely advise the child, citing *State v. Smith*, 431 So.2d 111 (La.App. 1 Cir.), *writ denied*, 434 So.2d 1092 (La.1983). However, we note that at the time these two decisions were rendered, *State in the Interest of Dino*, 359 So.2d 586 (La.1978), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722 (1978) was still in effect, requiring juveniles to consult with an attorney or adult before waiving their rights. Also, the attorney or adult had to be interested in the juvenile's welfare.

16

In *Little v. Arkansas*, 435 U.S. 957, 98 S.Ct. 1590 (1978), the United States Supreme Court upheld the lower court's ruling which found that the juvenile defendant had knowingly and voluntarily waived her rights prior to confessing to the crime. Justices Marshall and Brennan dissented from the majority opinion, reporting that they would have granted certiorari to resolve the question of whether a juvenile is entitled to competent advice from an adult who does not have a significant conflict of interest before waiving rights.

The facts in *Little* reflect that the mother of the thirteen-year-old defendant spent ten to fifteen minutes alone with the juvenile prior to her confession. Although the juvenile was afforded this opportunity, the dissenting judges raised the issue of the mother's competency. The juvenile's mother was suffering from the trauma of having her husband shot to death while he slept next to her, and she had been questioned earlier and believed she was a suspect in the shooting. Also, the juvenile's mother had been given tranquilizers not long before the juvenile's confession. The dissenting judges opined that these facts may have had an adverse effect on the juvenile's ability to make a knowing waiver of her own rights.

The dissent in *Little* also referred to the Court's ruling in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428. In *Gault*, the Court recognized that "special problems may arise with respect to waiver of the [Fifth Amendment] privilege by or on behalf of children" and that "the greatest care must be taken to assure that . . . [a child's confession] was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Id*. at 55, 87 S.Ct. at 1458. The *Gault* Court also recognized that the competence of a juvenile's parents is a relevant factor in determining the validity of the juvenile's waiver of rights.

17

In the instant case, J.M. and A.D.M. clearly had a significant conflict of interest, and we find that they were not sufficiently independent to serve as someone interested in the Juvenile's welfare. Moreover, the Juvenile was entitled to competent advice, and J.M. and A.D.M. were not competent to advise the Juvenile due to being the parents of the victim. At the time of the Juvenile's verbal confession to Detective Alexander, rather than counseling the Juvenile as adults interested in his welfare, J.M. and A.D.M. acted in their capacity as the parents of the victim and basically turned the Juvenile over to the authorities.

When the detectives arrived, they spoke with J.M. and A.D.M. who informed them that the Juvenile had lied, and with their permission, Detective Alexander pulled the Juvenile to the side, read him his *Miranda* rights, and then questioned him. Although Detective Alexander testified that the Juvenile's mother was present when he read the Juvenile his rights, the record indicates that neither J.M. nor A.D.M. were involved in the Juvenile's questioning and that they did not even hear his confession to Detective Alexander.

The Juvenile was then taken to the sheriff's office by detectives. There is no indication that the Juvenile was afforded a consultation with J.M. or A.D.M. prior to the second recorded interview or that either of them were concerned about the ramifications of the Juvenile's possible admission. Simply put, there is no indication in the record that anyone took the time to explain to this eleven-year-old juvenile that he faced significant punishment if he admitted to the offense. Moreover, J.M. and A.D.M. made no attempt at any time during the investigation to protect the rights of the Juvenile.

18

Considering the lack of evidence to indicate that J.M. and A.D.M. were interested adults, any presumption that the two possessed concern for the Juvenile's welfare necessary to genuinely advise him is negated by their obvious conflict of interest. Although *Dino* has since been overruled, and an interested adult is no longer a requirement, the fact that the Juvenile did not have an interested adult present remains a factor to be considered in the totality of the circumstances.

**Authority/Capacity:**

The fact that J.M. is not the Juvenile's biological father or legal guardian raises the issue of whether he could validly waive the Juvenile's rights. The record reflects that this issue was raised at the Juvenile's arraignment on May 14, 2008. The Juvenile was in court with J.M. because his mother was not available. At the outset of the hearing, counsel for the Juvenile informed the trial court that, against her advice and counseling, the Juvenile wished to enter an admission. When the trial court inquired about legal custody of the Juvenile, J.M. reported that he had never been given legal custody of the Juvenile, nor had he adopted the Juvenile. The trial court then concluded that as the Juvenile's stepfather, J.M. could not acquiesce to the pleading, explaining that the Juvenile's biological father or mother had the legal capacity to enter into such an agreement. The State argued that J.M. was acting on behalf of the Juvenile's mother because she could not attend the hearing. The trial court responded:

THE COURT:

Sir, in all due respect, I just don't think that you should be placed in the situation making this decision without his mother and/or his biological father being present. There's nothing to suggest, and it's not been alleged, that the biological father has given up the rights, his rights, to this child. So I would think if there's a joint -- I don't know what the custodial arrangement is -- if there's a joint custodial arrangement that

19

the father in this type decision, the biological father may have -- again, I haven't been made aware of the custodial arrangement between the biological mother and the biological father in this thing. But I would suspect that in a joint custodial arrangement that the biological father would have some input as to the extent to which this child may be exposed to the implications and ramifications of the admission to this petition.

Counsel, I don't mean to impinge or interfere with your legal counsel to this family. I may suggest that perhaps if for nothing else than an abundance of caution and recognizing the fact that it would simply add -- we could set it for Friday maybe.

In addition to a stepparent's authority to waive the rights of a juvenile, the jurisprudence was reviewed with respect to the authority of a biological parent to waive the rights of a minor child. Louisiana jurisprudence does not speak to this specific issue. Justice Marshall of the United States Supreme Court directly addressed this issue in a dissenting opinion in *David Levell W. v. California*, 449 U.S. 1043, 101 S.Ct. 622 (1980). In *David Levell W.*, a thirteen-year-old juvenile was taken from his home by police and transported to the police station for questioning. The police officers did not have an arrest warrant or probable cause for his arrest. Nonetheless, the lower court held that the juvenile's constitutional rights were not violated because the police officers acted on his mother's instructions.

Certiorari was denied by the Supreme Court. Justice Marshall, however, asserted that he would have granted certiorari, stating that the case presented an important question regarding a parent's authority to waive a minor child's right under the Fourth and Fourteenth Amendments to be free from unreasonable seizures. Justice Marshall explained:

Essential to this claim is the assumption that a parent's right to guide her child's upbringing includes the authority to waive a constitutional right that the child may have. I find this assumption extremely disturbing for I see no way to cabin its implications. If a parent may, without even consulting the child, waive his constitutional

20

rights, then the police may constitutionally coerce confessions from minors so long as the officers have the parents' consent to their action. Even more troubling, there is nothing in respondent's reasoning to preclude a juvenile court from finding a minor guilty upon proof less than beyond a reasonable doubt, as long as the parent waives that critical due process requirement. The view of parental authority advanced by respondent and adopted by the court below suggests no reason to bar these actions.

. . . . The court's view of parental authority rests on the supposition that petitioner was too immature to make the decision about whether to go to the station with the police officers for himself. But if that is the case, I find it hard to discern the logic of the same court's conclusion that petitioner was capable of making a knowing and intelligent waiver of his *Miranda* rights, whose application to a minor are not in doubt.

*Id.*, at 1048-49, 101 S.Ct at 625-26 (footnotes omitted). This issue has been raised in various courts across the United States with a wide variety of rulings, but no consensus.

Considering the Juvenile's young age, in addition to the glaring conflicts of interest his stepfather and mother had in protecting his rights versus guarding the safety of their daughter, we find that serious doubts are raised with regard to the Juvenile's statements and whether he knowingly and voluntarily waived his rights. Although the jurisprudence reflects that there is no absolute requirement that an attorney or guardian must be present with a juvenile suspect at the time of his statement, the facts of this case demonstrate the need for unfettered and competent guidance on the Juvenile's behalf. The record indicates that the Juvenile simply did not receive such guidance from his stepfather or mother.

Additionally, the trial court's finding that A.D.M. gave the Juvenile's stepfather permission to sit in on the his second interview belies the trial court's prior ruling wherein J.M. was not allowed to acquiesce to the Juvenile's admission to the petition. The trial court concluded that J.M. did not have the capacity as a stepfather

21

to proceed, disagreeing with the State's argument that with A.D.M.'s consent, J.M. had the right represent her interest. Likewise, it would seem that J.M. did not have the capacity to waive the Juvenile's rights at the time of the Juvenile's second recorded statement.

**Threats, Coercion, and Intimidation**:

The Juvenile argues that his second recorded statement was improperly induced by threats, coercion, and intimidation. The United States Supreme Court in *In re Gault*, 387 U.S. 1, suggests that with conflict associated with the waiver of the Juvenile's rights by his stepfather and mother, special consideration should be given to assure that the Juvenile's confession was not the result of fright or despair.

The record reflects several questionable incidents which we find influenced the Juvenile's decision to waive his rights and admit to committing the offense. First, just prior to his second recorded statement, the Juvenile was transported to the sheriff's office in Detective Primeaux's patrol unit, with J.M. and A.D.M. following behind. Although Detective Primeaux denied talking to or threatening the Juvenile during the ride, he admitted that in speaking with Detective Alexander, he spoke of stopping and hitting the Juvenile. Detective Primeaux maintained that the conversation was between him and Detective Alexander, that he was "joking," and that he never intended to follow through with the threat. Detective Primeaux did not testify, however, that the Juvenile was unable to hear his words or that he told the Juvenile to disregard what he said because he was joking.

Although the Juvenile was not under arrest, when they arrived at the sheriff's office, the Juvenile entered through the back entrance with detectives as if he had been arrested, while J.D. and A.D.M. entered through the public door. The Juvenile's

22

mother chose not to stay with him, sending him in to be interrogated with J.M., a man that is not only the father of the victim, but according to A.D.M., a man with whom the Juvenile had "friction" and who believed that the Juvenile had not been raised correctly.

Additionally, J.M. testified that during the interrogation, Detective Primeaux cursed at the Juvenile and told him to tell the truth "or else," and that he used a deep voice. J.M. described the encounter as getting "down to the nitty-gritty."

Although Detective Primeaux did not recall throwing a crumpled cup at the Juvenile during the interview, he stated that is was possible he had done so. Detective Primeaux also admitted that he turned off the lights while the Juvenile was alone in the interview room and did so because he did not feel that the Juvenile showed remorse. Also, Detective Primeaux was not joking at that time because he believed the eleven-year-old Juvenile was playing "hardball" and was not willing to cooperate, despite the fact that the Juvenile had already confessed and the interview had concluded.

Although the detectives maintained that the interview had concluded prior to turning off the lights, J.M. was not certain that the Juvenile was not questioned at all after the incident and believed that Detective Primeaux was intimidating the Juvenile at that time. Also, the detectives' testimonies differed with regard to how long the lights were out. Detective Alexander testified that the lights were off for less than a minute, while Detective Primeaux testified that the lights were off for only ten to fifteen seconds. There is no dispute, however, that when the lights were turned back on, the Juvenile was crouched down in a corner. When the Juvenile exited the room,

23

his mother observed that he appeared shaken. Lastly, the Juvenile's mother was unaware of the incident and testified that she would have objected to such treatment.

Considering the entire sequence of events from the time the Juvenile was picked up to the time his interview was concluded, we conclude that the eleven-year-old Juvenile's waiver was improperly induced by threats, coercion, and intimidation. The Juvenile was alone with detectives during the drive to the sheriff's office, with one detective admittedly "joking" about harming the Juvenile. After the Juvenile arrived, he entered the building without his family, via the entrance for suspects. The Juvenile's mother did not stay by his side to protect him, but chose to stay behind while her son was interrogated for two hours with his stepfather, a man with whom he had a strained relationship and whose biological daughter was the victim.

During the interview, the Juvenile was threatened to tell the truth "or else," he was cursed at, and he possibly had objects thrown at him. The timing of the incident involving the lights is not entirely clear and may have occurred after the interview had concluded. The incident, nonetheless, is demonstrative of the Juvenile's fear and lends further support to the credibility of the Juvenile's claim that he was intimidated, threatened, and coerced to waive his rights and confess to the offense, as well as Detective Primeaux's willingness to intimidate, threaten, and coerce a suspect.

**Totality of the Circumstances:**

As noted above, the totality of the circumstances is the standard of review for the instant case. *Fernandez*, 712 So.2d 485. The record indicates that the Juvenile turned eleven years old one week prior to his confession and was about to finish fourth grade. He did not have an interested adult present with him, nor did an interested adult explain his rights to him before he waived same and admitted to

24

committing the offense. The adults with whom the Juvenile's welfare rested had a conflict of interest between protecting the Juvenile's rights and protecting the safety of the victim. Also, the stepfather's interest in the Juvenile's welfare is highly questionable, as he is the biological father of the victim. Lastly, the record does not reflect that the adults even attempted to protect the rights of the Juvenile.

Although the jurisprudence is not clear as to the capacity of a biological parent or stepparent to waive the rights of a child, there is no evidence that any special consideration was employed by the detectives to assure that the Juvenile or J.M. and A.D.M. understood the Juvenile's rights and the consequences at the time the Juvenile made his verbal admission and at his second recorded interview. Instead, the record reveals that the totality of the circumstances, including the highly questionable behavior by the detectives to influence the Juvenile to confess to committing the offense, indicate that the Juvenile did not make a knowing and voluntary waiver.

For these reasons, we find that the State did not satisfy the burden of proving beyond a reasonable doubt that the Juvenile's confession was made knowingly and voluntarily, and thus, the trial court erred in denying the Juvenile's motion to suppress. Accordingly, the Juvenile's adjudication is reversed. As such, the remaining assignments of error are pretermitted.

## CONCLUSION:

The Juvenile's adjudication as a delinquent is reversed, his disposition is vacated, and this matter is remanded for further proceedings.

**REVERSED AND REMANDED**.